### IN THE

# SUPREME COURT OF THE STATE OF GEORGIA,

## AT MACON,

## JUNE TERM, 1858.

Present—JOSEPH H LUMPKIN, \
   CHARLES. J. McDONALD, } Judges. \
   HENRY L. BENNING,

ALEXANDER J. ROBISON, plaintiff in error, vs. ERASMUS BEALL, survivor, &c., defendant in error.

[1.] That the bills of a bank are below par does not make their circulation illegal.

[2.] Though the holder of the bills of a bank obtains them at a discount, he may collect them in full.

[3.] It is no defence to the parties to a note, when sued by the holder, that he has made a champertous agreement in reference to the note, with the attorney bringing the suit.

[4.] The Planters and Mechanics Bank of Columbus had the power to purchase and again to sell its own stock.

[5.] That a transfer of stock in the Planters and Mechanics bank of Columbus, was made after the failure of the bank, did not render the transfer void, and, therefore, did not prevent the transferee from becoming a stockholder, and as such, being liable under the 4th section of the bank's charter.

[6.] That the transfer of the stock of this bank, is made at a time when the bank is doing business, and is able to pay its debts, and made to a solvent person, does not, *per se*, relieve the stockholder making the transfer, from the liability created by the 11th section of the bank's charter.

[7.] The liability of the stockholders of the Planters and Mechanics bank of Columbus, expired, with the expiration of the charter of the bank.

Debt in Muscogee Superior Court. Tried before Judge WORRILL, May Term, 1858.

This was an action brought by defendant in error against Alexander J. Robison.

The declaration alleges that Robison was a stockholder in the "Planters and Mechanics Bank of Columbus" to the amount of 575 shares of stock, rated at $100 per share. The charter of the bank provided "that the persons and property of the stockholders shall be pledged and held bound in proportion to the amount of shares and the value thereof, that each individual or company may hold in said bank for the ultimate redemption of the bills or notes issued by said bank in the same manner as in common action of debt, and no stockholder shall be relieved from such liability, by sale of his stock, until he shall have caused to have been given sixty days' notice in some public gazette of this State." The plaintiff alledged that he was the holder of bills of the bank to the amount of $500, on which he had obtained judgment against Robert B. Alexander, assignee, appointed by the Legislature to take charge of and wind up the affairs of said bank, on which judgment execution had been issued and a return of *nulla bona* made thereon by the Sheriff. Plaintiff sought in this action to make the defendant, as a stockholder in said bank, liable for the payment of said bills.

The defendant filed a number of pleas; among others, the statute of limitations, the forfeiture of the charter of the bank, and the expiration of the charter by its own limitation, &c.

The plaintiff demurred to answering original interrogatories served upon him in accordance with the statute, which demurrer was sustained, and the defendant excepted.

Plaintiff proved that he was the holder of $500 of the bills of the bank, and that he had sued said bank to insol-

Robison vs. Beall.

vency on the same.   The defendant objected to the execution of plaintiff against the bank being read in evidence, because no term intervened between rendition of verdict and judgment, issuing of execution and return of *nulla bona* thereon; which the Court overruled and defendant excepted.

Plaintiff proved the circulation of the bank on the 7th February, 1843, to be $231,300, defendant objected to its going in evidence to the jury, which was overruled and defendant excepted.

Plaintiff proved defendant's ownership of stock by the transfer book.

Defendant objected to the transfer from Ragan, Cashier of the bank, to defendant being read in evidence, which was overruled and defendant excepted.

Defendant objected to other transfers going in evidence, made by Smith, as attorney for Redd and Morgan, because there was nothing to prove that Smith was their attorney in fact, which was overruled and defendant excepted.

Plaintiff closed his case and defendant moved a nonsuit because the plaintiff had not proved the circulation of the bank at the time of the trial, or at the time the doors of the bank were closed, when he had alledged the circulation at these times, which motion was overruled and defendant excepted.

Defendant opened his case, and read the jury the testimony of A. B. Ragan, under agreement of counsel, to-wit: "He was one of the first directors of the Planters and Mechanics Bank, and who acted, for a while, as cashier, proving by him that a portion of the stockholders met in 1837 to organize the bank; a few of them paid in specie, some in bills of the State Bank, and others in indorsed notes.   An arrangement was made, through a committee, with the cashier of the Bank of Columbus, that said cashier would give them a specie certificate for

the purpose of organizing. Some time subsequent to May, 1837, the president and several of the directors—witness among them—went to the cashier of the Bank of Columbus and asked for the specie; he showed them certain kegs and boxes, which he stated contained $230,000 in specie, and stated that he procured a specie certificate from the Insurance Bank for the balance, to make up the sum of $250,000. The kegs and boxes were not examined to see whether they contained specie, but the statement of the cashier to that effect was relied on. His statement was, without inquiry, also relied on with reference to the Insurance Bank certificate.— The directors held a meeting and determined to do no business, but passed an order to loan out the money to the stockholders, if they wanted it. The stockholders, generally, borrowed it, receiving checks on the Bank of Columbus. Witness never heard of any demanding specie, except one person, and the bank refused to pay him specie. In February, 1838, the annual election for directors took place, and an order was passed that the stockholders who had borrowed of the bank, should reduce their debt by paying in one half. Those who complied did so by paying in, mostly, the bills of suspended banks. Not more than $800 or $1000 dollars of specie was paid in. The new stockholders put in their notes in place of those from whom they purchased. The directors then ordered $250,000 of bills to be issued, the larger portion of which were put in circulation—witness could not tell how much."

Defendant then proposed, under the agreement of counsel, to read the statement of Mathew Robertson. The plaintiff objected to the following part of said statement going to the jury, to-wit:

" The condition and credit of the bank was good until the spring of 1841, when its bills were at from 5 to 10 per cent. discount; and by the spring of 1843 they were only worth 5 or 10 cents in the dollar. His opinion was that, all the time the bank was solvent, and that even when it closed doors, if

properly managed, the assets were ample to pay all its debts. Does not remember at what particular time the assets ceased to circulate as money. Thinks Adkins owned the bills sued on in 1842, and may be in latter part of 1841. One of those years thinks Adkins told him he was buying them at a discount, and it was his opinion that Bailey, Wiley & Dougherty did not own them until after the forfeiture of the charter. He was all the time in the bank and does not remember that any one of the billholders presented their bills or enquired what they were likely to get for them. Thinks Bailey and Wiley could have done so if they had owned them ; never heard of Wm. Dougherty being a creditor of the bank till long since some of these suits have been commenced, and thinks if he had been he would have sued much sooner than he did. At the time of the assignment the bank was winding up, and if let alone thinks it would have paid all its debts It had the means and disposition to do it. The assignment was generally known and approved, was known, he thinks, to most of the billholders, and he never heard an objection or intimation of disapproval from one of them." The Court sustained the objection and the defendant excepted.

The defendant read the balance of Robertson's statement to the jury which proved bills of the bank unredeemed and in circulation when the bank closed its doors, 26th May, 1843, to be $226,000.

Transfers of stock on the book witnessed by me were made by the parties whose names are signed as transferring the same.

A large portion of the bills left and paid out in circulation when the bank closed its doors were circulated by the Bank of Columbus upon the faith of a bond given to said bank by some of the stockholders and directors of the Planters and Mechanics Bank.

Defendant then introduced John Banks, who stated, among other things, that he refused to unite with the directors in making the return to the Governor under oath, because he

was not satisfied that the specie was at the control of the bank, and gave various reasons why he was not satisfied of the fact. Has been released as director and stockholder from liability to the Bank of Columbus, from the stock he got of Terry, of Mississippi; was released from the stock he got originally. Has been released by Mr. Dougherty in all the cases he represented.

Defendant then asked the witness what amount of bills he had on hand after the bank made its assignment, and after the forfeiture of its charter, and whether he had not paid said bills out for a plantation in Stewart county. The question was objected to by plaintiff, and objection sustained and the defendant excepted.

Defendant then read the return of the President, Bailey, and Directors, to the Governor, and the affidavit that the bank had been organized by strict compliance with the terms of the charter.

Defendant proposed to read the deed of assignment to Alexander, and the judgment of forfeiture of the charter of the bank, which was refused by the Court, and defendant excepted.

Defendant proposed to read in evidence the plaintiff's answer to the eleventh interrogatory propounded to him by defendant, which was refused, and defendant excepted.

The answer to said interrogatory discovered the fact that Mr. Dougherty took the bills of the plaintiff for collection, paying all expenses of litigation, and receiving half the recovery for his compensation.

Bills to large amounts were proven to be in possession of Mr. Dougherty, belonging to Bailey and Bonner, former Directors, a large amount in the hands or control of Mr. Mustian, which he said the bank owed him nothing upon; a large amount to belong to the Bank of Columbus, a large amount in the hands of the assignee of the Planters and Mechanics Bank, and an amount in the hands of Hines Holt, a former

Director, and $1,530 to be in the possession and belonging to the defendant.

Defendant also read a receipt from Edward Carey to Chambers, releasing him as stockholder and director, from all liability to the Bank of Columbus.

Defendant then closed his case, and the Court charged the jury as follows:

That to enable the plaintiff. to recover his demand of the defendant, he must show that he is a bill holder, and the defendant a stockholder; the outstanding circulation of the bank at this time, and that he has sued the bank to insolvency. It is conceded that the plaintiff owns $500 of the bills of the bank, and has sued the bank to insolvency. The defendant's liability is a secondary liability. There is no controversy about the defendant's owning 100 shares of stock in the bank. The plaintiff insists that the defendant owns 575 shares of stock in the bank, and that he is liable on them to plaintiff. Defendant insists that if he is liable at all, he is only liable on 100 shares. That is for you. to determine between them. It is admitted that McDougald purchased and had transferred to the name of the defendant 475 shares.

Now, if you think that McDougald did purchase and transfer (for the purpose of hiding it from the public,) the 475 shares to defendant's name, and that the defendant knew at the time the object of McDougald, and acquiesced in it, he is liable on them. But if the defendant was ignorant of it, and when he found it out he did, in a reasonable time, divest himself of it, he is not liable on these 475 shares. But if he was ignorant of it at the time, and after finding it out, he neglected it for a considerable period, and thereby enabled McDougald to commit a fraud upon the public, he is liable on them.

The great question in the case is, is the defendant liable on these 475 shares? for it is conceded if he is liable at all, he is liable on 100 shares, the other shares which it is admitted

he owned. The defendant's liability is in the proportion his stock bears to the capital stock of the bank. Stockholders are bound to redeem the liabilities of the bank in this *pro rata* measure. Then, you must ascertain the circulation. One witness, (M. Robertson,) it is admitted, says, at a certain time, about the winding up of the bank, it was $226,000; it is further admitted the book " State of the Bank" shows that on 7th February, 1843, it was $231,310. The law presumes where a fact is shown to exist once, it continues to exist until the contrary is shown. It is conceded that the bills of the Planters and Mechanics Bank, belonging to the Bank of Columbus, do not constitute any of the liabilities to be redeemed by the stockholders, for the Planters and Mechanics Bank was illegally organized, and the Bank of Columbus was a participant in the organization, and therefore, you will not take that amount into consideration. Plaintiff's counsel admitted that you will not take Mustian's, or Bailey's, or Bonner's, or the bills in the hands of the receiver, into consideration, in finding the amount of the outstanding circulation. The defendant is bound to redeem his *pro rata* part of the circulation at this time. It is admitted that the defendant has in his possession $1,530 of the bills of the Planters and Mechanics Bank. The law presumes he has redeemed that amount, and you must give him credit for that amount. If you should believe his liability does not exceed that amount, find for the defendant with costs of suit. But if you should believe that his liability exceeds that amount, subtract that amount from the amount you find him liable for, and give the plaintiff verdict for the balance. To all and every part of which charge, as delivered by said Court to the jury, the defendant by his counsel then and there excepted, and now assigns the same as error.

The defendant then by his counsel ask the Court to charge the jury, that if they believe that John Banks' *pro rata* liability on 200 shares of stock was $2,000, and the plaintiff, for a valuable consideration, has released him from his *pro rata*

liability on said stock, such release will prevent the plaintiff from recovering any thing from defendant, or any portion of said stock transferred to him directly or indirectly by John Banks, even though the plaintiff's claim is $500, and he received from John Banks but $100, or it is not in proof how much plaintiff received.

2d. And that if they believe that more than four years elapsed between the accrual of plaintiff's cause of action and the commencement of this suit, then it is barred by the statute of limitations.

3d. And if they believe from the evidence that more than six years elapsed between the accrual of plaintiff's cause o action and the commencement of this suit, it is barred by the statute of limitations.

4th. And if they believe that more than four years elapsed between Sheriff's return of *nulla bona* on the *fi. fa* in favor of plaintiff vs. Planters and Mechanics Bank and commencement of this suit, then it is barred by the statute.

5th. And if the jury believe that more than six years have elapsed between the return of *nulla bona* on plaintiff's *fi. fa.* against the Planters and Mechanics Bank and the commencement of this suit, then it is barred.

6th. And if the jury believe that more than four years elapsed between the deed of assignment by the bank to Alexander, or between its recognition by the Act of 1843 and the commencement of this action, then it is barred by the statute.

7th. And if the jury believe that more than six years elapsed between the deed of the bank to Alexander, or between the recognition by the Act of 1843 and the commencement of this action, then it is barred.

8th. And if the jury believe plaintiff's action is "founded on notes," (bank bills,) and more than six years elapsed between their date and the commencement of this suit, then it is barred.

9th. And that an action of debt is barred in four years.

10th. And that an action of debt is barred in six years.

11th. And if the jury believe that more than four years elapsed between the failure of the bank to pay its bills in spe_cie and the commencement of this suit, then it is barred.

12th. And if the jury believe than more than six years elapsed between the failure of the bank to pay its bills in specie and the commencement of this action, it is barred.

13th. And if the jury believe from the evidence that the defendant became a stockholder by transfer from other stockholders after the failure of said bank, and the stockholders so transferring to defendant had not been discharged from liability in terms of the charter, then said stockholders remain liable to bill holders, as sought to be enforced in this action, and the defendant is not liable.

14th. And if the jury believe from the evidence that the defendant had, before the assignment made by said Banks, and before the forfeiture of its charter, and while said bank continued to do business, and was able to pay its debts, transferred the stock held in his name, or any part thereof, to solvent and responsible parties, then the persons to whom he so transferred are liable, as sought in this action, and not this defendant.

15th. And to charge that if the charter of the Planters and Mechanics Bank expired by its own limitation on the 1st January, 1856, such expiration extinguished the plaintiff's debt, and that he cannot recover.

The Court refused each and every one of said charges, to which the defendant excepted, and on these several exceptions assigns error.

HOLT; and HILL, for plaintiff in error.

DOUGHERTY, for defendant in error.

*By the Court.*—BENNING, J. delivering the opinion.

The Court decided that, Beall, the plaintiff, was not bound to answer any of the interrogatories propounded to him, ex-

Robison vs. Beall.

cept the first. And the first question is, was that decision right?

The interrogatories as to which this decision was made, had two objects in view; one, to prove that Beall obtained the bills at a discount—the other, to prove that he had made an agreement with his attorney, Mr. Dougherty, by which, Mr. Dougherty, was to bring suit for the collection of the bills, was to be responsible for the costs of suit, and was to have for pay, one-half, or one-third, or some other part of the money that might be collected.

We think, that neither of these objects was sufficient to require the interrogatories to be answered.

[1.] There is no law prohibiting the circulation of notes that are under par, whether the notes of corporations, or those of natural persons; and, in practice, notes under par, circulate as other notes.

[2.] Nor is there any law, saying, that one who purchases notes at a discount, shall not collect out of those liable on the notes, more than he gave for the notes. Of what concern is it to those persons, whether he gave for the notes, much or little, or even gave nothing. *Their* bargain was to pay all the notes call for, and, to any one who should present the notes.

[3.] Suppose it true, that Beall made a champertous agreement with his attorney, for the collection of the bills, yet did that make the bills themselves void as between *Beall and the parties liable on the bills?* No one will say so. But unless the bills were thus void, Beall had the right to sue upon them, and to collect them. Now, the suit brought is one which is Beall's, and which is upon the bills, which takes no notice whatever, of the existence of the supposed champertous agreement. It is not a suit to enforce that agreement; it is not a suit, the judgment in which, could be used in any way to help out, or ratify, that agreement. It would seem to follow, then, that if the champertous agree-

ment did not make the bills themselves void, Beall had the right to sue upon them, as he has done in this case.

We think, then, that the Court was right in not requiring the interrogatories to be answered, and was also right, in refusing to permit the answer to the eleventh of them, to be read.

One of the transfers of stock was "signed by A. B. Ragan, cashier." A. B. Ragan was the cashier of the bank, at the time of this transfer. This transfer was objected to, on the ground, that "the bank could not transfer stock,"—the meaning of which ground seems to have been, that the bank was forbidden to become the owner of its own stock, and, therefore, could not have had any stock to transfer. The objection was overruled, and the transfer received.

No law was read to us, prohibiting banks from acquiring title, to their own stock. And we do not know of any such law. And, as to *this* bank, its charter says, that it shall be, "able and capable in law, to have, purchase, receive, possess, enjoy, and retain," " lands, rents, tenements, hereditaments' goods, chattels, and effects, of what kind, nature or quality, whatsoever, and the same to sell, grant, demise, alien, or dispose of." *Pr. Dig.* 125. Here is an express grant of power to "purchase" and of power to "sell," every kind of "goods, chattels, and effects."

So the third section of the charter declares that "if there shall be a failure in the payment of any sum subscribed for," the shares upon which such failure shall happen, shall be forfeited, and they may again be sold, and the proceeds of the sale, together with the sums paid on the shares, shall revert to the benefit of the corporation. And see section 15.

[4.] We think, then, that the Court was right in admitting the transfer.

Two of the transfers to Robison, were signed by H. S. Smith, as attorney—one by him, as attorney for Wm. A. Redd, the other, by him, as attorney for Jno. E. Morgan. These two were objected to, on the ground, that " there was

no evidence of Smith's being attorney for Redd, or for Morgan." The Court overruled the objection.

It is no doubt true, that these two transfers were void, unless Smith had authority to make them, or his making them was ratified by Redd and Morgan. The Court, in deciding that they were admissible, did not decide, that it would not be necessary, after their admission, to show Smith's authority. And, accordingly, some evidence was offered, going to show Smith's authority—doing so, it is true, in a very indirect, and perhaps a very slight manner. This evidence was, that Robison made a subsequent transfer of four hundred shares of the stock; and, that, without the shares transferred to him by Smith, he did not have four hundred shares, to transfer. If Robison transferred the shares which Smith, as agent, had transferred to him, he did what carried within it, a *prima facie* admission, slight, it is true, that Smith had authority to make the transfer to him.

At all events, we do not think, that the Court erred in *admitting* the transfers in the first instance; and no motion was made to rule them out, for a failure to prove Smith's authority.

Much of the statement of the witness, Mathew Robertson, which was rejected by the Court, consisted of what was his opinion, the materiality of the rest is not apparent to us,—not that we mean to say, that we think any of the statement to have been material. This it is not necessary to decide. There was no motion for a new trial.

The exceptions relating to the statute of limitations, we passs without deciding.

The thirteenth request to charge, was, that if Robison became a stockholder by transfer from other stockholders after the failure of the bank, and those stockholders had not been discharged from liability, in terms of the charter, they remained liable, and Robinson was not liable.

This request seems to be founded upon the assumption, that a transfer of stock made after a failure of the bank,

would be void,—and therefore, that such a transfer would not make the transferer become a non-stockholder, or the tranferee, a stockholder.

But we do not see any authority for the assumption, that a transfer of stock made after a failure of the bank, would be void. The charter does not seem to know any difference between the right of transfer before a failure of the bank, and the right of transfer afterwards. It merely says, in general terms, that the directors "are authorized to open transfer books, by agents or otherwise, whenever they may deem it advisable." (14. Sec.)

It is true, that the 16th section says, "that in case of a failure of the said bank, all the stockholders who may have sold their stock at any time within six months prior to said failure, shall be liable in the same manner as if they had not sold their stock." But this is a provision for a different case, that of a transfer *"prior"* to a failure of the bank— and the provision, even for that case, is not that the transfer *shall be void,* but that the stockholder making it, shall remain liable in the same manner as if he had not made it. Indeed, the provision, by speaking of the stock as having been "sold," itself silently assumes, that the sale, (or transfer,) would be good.

Different was the provision on which, *Lumpkin et al. vs. Jones,* turned. That provision was, "that all transfers of stock in said bank shall be wholly void, if made within six months previous to the failure of the said bank," &c.

Different too are the provisions on which, the decisions from other States went.

These things being so, and the 11th section of the charter declaring, that "no stockholder shall be relieved from" his "liability, by sale of his stock, until he shall have caused to have been given, sixty days notice in some public gazette of this State;" and, there not being any evidence, that such a notice was given by Robison, we think, that the Court was right in refusing this 13th request.

Robison vs. Beall.

The fourteenth request was, to charge, that if Robison had, before the assignment made by the bank and before the forfeiture of its charter, and while it continued to do business and was able to pay its debts, transferred the stock held in his name, or any part thereof, to solvent and responsible parties, then they and not Robison, were subject to the liability sought to be enforced by this action.

The liability here referred to is, that created by the 11th section of the charter; a section which is in these words: " The persons and property of the stockholders shall be pledged and held bound, in proportion to the amount of shares and the value thereof that each individual or company may hold in said bank for the ultimate redemption of the bills or notes issued by said bank, in the same manner as in common actions of debt, and no stockholder shall be relieved from such liability by a sale of his stock, until he shall have caused to have been given, sixty days notice in some public gazette of this State."

Two things seem to be clearly expressed by these words; 1st. That the stockholders are to be under a certain liability, at least whilst they are stockholders: 2dly, that they are not to be relieved from this liability, whatever it is, by a sale of their stock, until they have caused to be given sixty days notice of the sale in some public gazette.

The question then is, what is this liability which they are under? The section says, it is a liability " for the ultimate redemption of the bills or notes issued by the bank." The words " bills or notes issued by the bank," are certainly such, that they will include, in the case of any stockholder, at least, all of the bills or notes that had been issued when he became a stockholder, and all that were issued whilst he remained a stockholder.

Robison sold his stock in 1841. The bills on which, the suit is founded, were issued in 1838. They therefore, at least, are bills to the ultimate redemption of which, his liability extends.

We see no error in the refusal of the Court to give to the jury this, the fourteenth request to charge.

The fifteenth request to charge, was : " That if the charter of the P. and M. Bank expired by its own limitation on the 1st of January, 1856, such expiration extinguished the plaintiff's debt." This request was refused ; and the question is, was that refusal right ?

When the charter of a corporation expires, all things which owe their existence to the charter expire too, unless there is some special law to prevent them from doing so. To deny this, is to deny that, when the cause ceases, the effect ceases ; that, when the body dies, the limbs die.

One of the things which owed its existence to the charter of the Planter's and Mechanics' Bank, was the bank itself, as a corporation. Therefore, when that charter expired, the bank, as a corporation, was dissolved, unless there was some special law to prevent it from being dissolved.

There was no such law. The acts of 1840, 1841, 1842, and 1843, extend to the case in which there are proceedings for the *judicial* forfeiture of a charter; not to the case in which there is an expiration of a charter. The act of 1855 (acts 226) does not seek to prevent the expiration of a bank's charter, from working a *dissolution* of the bank.

Consequently, when the charter of the P. and M. Bank expired, the bank was dissolved.

What effect did *the dissolution of the Bank* have on the debts due from the Bank ? The effect to extinguish them, unless there was some special law, to prevent it from having that effect.

" At common law, upon the civil death of a corporation, all its real estate remaining unsold, reverts to the grantor and his heirs ; for the reversion in such an event is a condition annexed by the law, inasmuch as the cause of the grant has failed. The personal estate, in England, vests in the King, and in our country in the people or State, as succeeding to this right and prerogative of the Crown. The debts due to,

and from it are totally extinguished."—*Ang. and Ames. Corp.* 667.

" At common law, upon the dissolution of a corporation, the debts due to and from it are extinguished." Head notes *in Hightower vs. Thornton,* 8 *Ga.,* 486. Head notes are made by the Judges.

" Why so much time and talent, labor and learning have been employed to establish a proposition which nobody denies, viz : that the debts of a corporation either to or from it are extinguished by its dissolution, I am at a loss to comprehend." *Thornton vs. Lane,* 11 *Ga.,* 491.

" Moreover, I agree that the elementary writers, both in England and the United States, do everywhere assert distinctly, that the debts due to and from a corporation, are extinguished by its dissolution, unless prevented by the terms of the charter itself, or by *aliunde* legislation ; and, that in the Courts of both countries, this doctrine may now be considered too well settled to be overthrown or shaken ; and so totally extinguished, that the members of the corporation cannot recover or be charged with them in their natural capacities." *Lumpkin J. in Moultrie vs. Smiley,* 16 *Ga.* 294.

"For all the purposes of this decision, we have conceded that all *corporate* rights and liabilities are extinguished by the dissolution of the bank on the first of January 1852."— *Lumpkin J., Id.* 324.

" The difficulty which has arisen, as I think, grows out of an error in applying the common law rule, that upon the dissolution of a corporation, its real estate reverts to the grantor ; its personal estate goes to the Crown, (in this country to the State,) and its debts are extinguished, to the case made against these plaintiffs in error." *Starnes J. Id.* 331.

To the same effect are the decisions elsewhere made. See *White vs. Campbell et al.* 5 *Humph.* 38 ; *Paschall vs. Whitsett,* 11 *Ala. N. S.* 472; *President &c. of Port Gibson vs. Moore,* 13 *Smedes and Mar.* 158 ; *Fox. vs. Horah,* 1 *Ire. Eq. R.* 358; *Coulter et al. vs. Robertson,* 2 *Cushman R.* 321 ; *Vi-*
xxvi.—3

*ner Abr. Rent, B. b.* 4; *Edmonds vs. Brown and Sillard,* 1 *Levinz* 237; *Mayor of Colchester vs. Seaber,* 3 *Burr.* 1866; see my opinion in *Moultrie vs. Smiley,* 16 *Ga.* 344 *et Seq.,* and in *Robinson vs. Lane,* 19 *Ga.* 380 *et seq; Vin. Corporations* (*I.*) 6 (*I.* 3 7) 11.

There is, then, universal accord in this; that the rule of the common law is, that on the dissolution of a corporation, the debts due to and from it are extinguished. *Extinguished* is the word.

According to this rule, therefore, the effect of the dissolution of the Planter's and Mechanics' Bank, was, to extinguish the debts due from the Bank.

But whatever extinguished the debts, as against the Bank itself, equally extinguished them, as against the Bank's stockholders; for these were only ultimately liable for those debts; that is, liable only after the bank; and it is a general principle of law, that whatever extinguishes the debts, as to the party primarily liable, equally extinguishes it as to the party secondarily, or ultimately, liable.

According, then, to the common law rule, when the Bank was dissolved, the debts due from it, were extinguished, both as to itself, and as to its stockholders.

I am aware that this conclusion is denied and denied on the ollowing argument: the *reason* of the common law rule is, hat, on the dissolution of a corporation, there is, commonly, left no person to sue, or be sued, for the debts due to and from it; but, on the dissolution of this corporation, there were left persons to be sued for the debts due from it on its bills, viz., the stockholders; therefore, as it regards those debts of this corporation, the reason ceasing, the rule ceased, and they were not extinguished. 16 *Ga.* 294. But I meet this argument with three answers, any one of which is, I think, sufficient:

1. Courts cannot set aside a plain rule of law, on a mere conjecture; on, what they guess to be the reason of the rule; and, it is the merest conjecture, that the want of some per-

son to sue or be sued, is the reason of this rule; nay, a con-- jecture against which, there is to be set, another conjecture, equally plausible ; viz., a conjecture that the reason why the law extinguishes the debts of a dissolved corporation, is, that the law first strips it of all its means of paying those debts, by causing its lands to revert, and its goods to escheat.

2. Numerous cases exist in which, there was somebody to sue and be sued, and yet, in which, the rule was applied. (See cases above.) In the case of the President &c., of Port Gibson vs. Moore, there was the *very corporation itself* to be sued ; for the dissolved corporation had been *revived.* In the Mayor of Colchester vs. Seaber, there was an old char- ter, and a new. Seaber's defence was, that the corporation created by the old charter, had been *dissolved,* and, that his bond given to that corporation, was, consequently, extin- guished—and, that being thus extinguished, it could not be collected by the new corporation, although that was the old corporation, revived. This was his defence; and it shows on its face, that there was some one to sue and be sued,—the re- vived corporation to sue, and Seaber to be sued. Yet the de- fence was not demurred out. No; it was met by a denial of the allegation, that the old corporation had been *dissolv- ed.* Had that allegation been true, there was no question, with Court or counsel, but that the defence would have been good. In Edmonds vs Brown and Sillard, Brown and Sil- lard had signed their names to the bond of the corporation. Yet, when it appeared, that the corporation had been dissolv- ed, a *nonsuit* was granted in their favor. The case did not go off on the plea of *non est factum,* though that was in. It could not go off on that plea, for the plea was not true. Brown and Sellard did sign the bond, and the bond, thereby, became their deed. This is the foundation case. Here were persons to sue, the actual subscribers to the bond. Yet the rule was applied.

These three cases are but samples of those above cited.

3. It is not true, that, as it regards the debts of this Bank

due on its bills, the reason of the rule ceases. Those debts were the debts of the Bank, as well as of the stockholders; and, when the bank was dissolved, there was no person left to be sued for them, in so far as they were the debts of the bank. The reason, then—the want of somebody to be sued— *existed*, for applying the rule to them, in so far as they were the debts of the bank. According to the very argument itself, then, the rule applied to the debts in so far as they were the debts of the bank. But if the rule applied to them to that extent, it *extinguished* them to that extent; for it certainly extinguishes, wherever it applies. And, if it extinguished the debts in so far as they were the debts of the bank, that was also extinguishing them in so far as they were the debts of the stockholders—for the debts were debts on which, the bank was bound as the primary party, and the stockholders, only, as the ultimate parties; and the extinguishment of the debt, as against the primary debtor, is its extingnishment, as against all the other debtors.

For a fuller notice of this argument, I refer to my opinion in *Robison vs. Lane* 19 *Ga.* 380 *et seq.*

I repeat, then, that, according to the common law rule, when the bank was dissolved, the debts due from it, were extinguished, both, as to iself, and as to its stockholders.

In the language of Chancellor Kent—"According to the old settled law of the land, where there is no special statute provision to the contrary, upon the civil death of a corporation, all its real estate remaining unsold, reverts back to the original grantor and his heirs. The debts due to and from the corporation are all extinguished. Neither the stockholders nor the directors or trustees of the corporation can recover those debts, or be charged with them in their natural capacity." 2 *Kent Com.* 307.

Is there any special law to prevent the rule from applying to the debts of this bank. Neither the Act of 1840, or that of 1841, or that of 1842, or that of 1843, is such a law—for

each of those Acts is confined to the case of a corporation whose charter is sought to be forfeited by [a *judgment* of Court.

There is, it is true, the Act of 1855; (Acts 226;) but that is not, I think, such a law. The reason I have for thus thinking, I will state in the latter part of this opinion.

For the present, then, I say, that there was no special law to prevent the common law rule from applying to these debts, and therefore, that it did apply to them, and extinguish them, both as to the bank and the stockholders.

The effect, then, which the *dissolution of the bank* had on the debts due from the bank, was to extinguish them, both as to the bank, and as to the stockholders.

But the bank, as a corporation, was not the only thing which owed its existence to the charter; the liability of the stockholders for the ultimate redemption of the bills of the bank, was another thing which equally owed its existence to the charter. See 11th section of the charter. It must equally follow, therefore, that when the charter expired their liability expired. Whatever reason there is for saying, that the corporation itself expired on the dissolution of the charter, there is also for saying, that this liability expired on the dissolution of the charter. The existence of the corporation, was, in no greater degree, caused by the charter, than was the existence of the liability. On the other hand, the existence of the liability, was as exclusively due to the charter, as was the existence of the corporation. If the maxim, the cause ceasing, the effect ceases, applies to the corporation, it equally applies to this liability.

I might then rest the proposition, that when the charter expired, the liability of the stockholders expired, on this axiom: that when the cause ceases the effect ceases. But there is abundance of authority, to support the proposition. I merely refer, in this place, to a single case, and to the cases which it cites, and that is, the case of the *Bank of St. Mary's vs. Clayton*—12 *Ga.* 475.

There is no special law at all touching this liability of the stockholders.

It is true, then, that when the charter expired the liability of the stockholders, which owed its existence to the charter, also expired.

This is the same conclusion which we had obtained from the proposition, that when the bank was dissolved, the debts due from it, were extinguished.

Thus, then, we have the conclusion from two different and independent sources.

And is it not a conclusion in perfect harmony with other results of the dissolution of a bank? They are, that the dissolved bank shall be stripped of all its *property* and effects —that its lands shall revert to the grantor; that its goods shall escheat to the State; that the debts due *to* it, shall be extinguished. Ought it not to be, then, also, that the debts due *from* it should be extinguished? When the law gets all of a bankrupt's property and effects, it extinguishes the debts against him. This is the principle of bankrupt laws.

And, then, to dissolve a bank in the face of such results, without providing against them, must be an act of mere reckless mischief, sufficient to deprive those at whose instance it is done, of the right to complain, if, when the question comes, which, among innocent parties, are to be preferred, they are left out. Ought they to stand on as good a footing, as the accommodation drawers and endorsers for the bank, or as any guarantors or sureties of the bank. And the stockholders, by the very terms of their engagement, are nothing but guarantors or sureties for the bank. But for those terms, they would, no more, be at all liable for the debts of the bank, than would any other strangers. They have suffered once already by the bank; they have lost all the money they put in it, for stock—and it was that money, really, which the creditor in dealing with the bank, agreed to look to, as his *principal* debtor. The stockholder, then, is,

not only, by the terms of his contract, but by the principles of equity, only a surety.

Now what is offered in opposition to this double conclusion? That either set of the premises from which it is drawn, is not true? No. That it is a conclusion not authorized by those premises? No. What then? This, that it is a conclusion in conflict with the decisions of this Court; and, that, this Court is bound to follow those decisions, by the maxim, *stare decisis.*

I proceed then, to inquire, first, whether it is true, that the decisions of this Court are in conflict with this conclusion. Secondly, whether, if that is true, as to them, or any one of them, this Court is bound to follow them by the maxim, *stare decisis.*

First, then, is it true, that the decisions of this Court, are in conflict with this conclusion?

Now it cannot be that they are, unless the cases in which they were made, are *analogous* to this case. Let us bear in mind then, what this case is. It is, in the first place, a case against a *stockholder*, not, against a *director ;* and, in the second place, it is a case in which, the defence is, the *extinction* of the charter, not its forfeiture by the *judgment* of a Court.

And let us also bear in mind the following things. There is an act of the legislature, the act of 1842, (*Cobb Dig.* 118,) which, referring to this, and other banks, then suspended, has these words. "The Judge shall pronounce the judgmen. of the dissolution of said corporation for all purposes, whatsoever, saving and excepting, as to its power in its corporate name, to collect and pay its debts, and to sell and convey its estate, real and personal." By these words, manifestly, the dissolution to be brought about by *a judgment,* was to be, not really a dissolution at all ; certainly, not a substantial or total dissolution, but was to be, no more than a formal or partial dissolution. Now the difference between such a dissolution, and a substantial or total dissolution, is nearly as great

as is the difference between no dissolution at all and dissolution. Consequently, it might well be, that extinguishment of the corporation's debts, would not follow such a dissolution, and yet, would follow a substantial dissolution—such a dissolution as is wrought, by the *expiration of the corporation's charter*. It must follow, that cases in which the dissolution was, by the judgment contemplated, (or held to be contemplated,) in the act aforesaid, are not *analogous* to cases in which, the dissolution was, by the expiration of the Charter, and, therefore, that the maxim, *stare decisis*, cannot apply between the two sets of cases.

Bearing these matters in mind, let us proceed to the decisions.

The first of the decisions is that in *Lane vs. Morris* (8 *Ga.* 468.)

In that case, the action, as, in the present, was against a stockholder of this bank, and a defence was; " that if the defendant ever was a stockholder, all his rights and liabilities, except so far as saved and reserved by statutory provision, had long since ceased and determined, by the forfeiture of the charter of said bank, viz: on 13th June 1843, as appears by the judgment of the Court declaring the forfeiture."

The defence, then, is, forfeiture or dissolution by *judgment;* and it is a defence which i tself admits, that liabilities were saved by *". statutory provision"*—doubtless meaning the said Act of 1842.

There is, therefore, between this case, and the one in hand, the very want of analogy above adverted to. The decision in it, therefore, cannot be a law for the decision of the case in hand—and this is true, no odds what the grounds might be, on which the decision was put.

It is not clear, however, what the grounds were, on which the decision was put. The decision was, that the defence was not good, but whether the ground of the decision was, the act aforesaid of 1842, or was something else, is not stated.

What the Court said, was as follows: " Counsel for the defendant below and in error, argued, that upon the dissolution, of this corporation the debts due to and from it were extinguished ; and that nothing could save the case from the operation of this common law principle, but the legislation which had intervened, appointing a receiver to collect and pay over the assets, that, consequently, all proceedings must be conducted in his name, and that a party who claims the benefit of this legislation, must pursue his remedy in accordance with it. The Court sustained this position and ruled that the action could not be maintained by the present plaintiff, but that under the Act of 1842 and 1843 appointing an assignee, suit could be brought by him only, and no one else."

" In the opinion of this Court, the right of the billholder, under the 11th section of the charter, to hold the personal property of the stockholder pledged and bound for the ultimate redemption of the bills and notes of the bank, in proportion to the amount of his shares and the value thereof— a right which is not *primiary* and *total,* but *secondary* and *proportional*—is one which he may assert in his own name, before or after the *formal* dissolution of the corporation ; one which is wholy above and beyond the reach of any legislation, and independent and irrespective of it. The power and duty of the receiver, appointed by the legislature was to take charge of and collect as early as practicable, the debts and demands due and owing to the bank, and to pay off and discharge its liabilities. *See Pamphlet Acts* 1842, *p.* 29, 1843 *p.* 21, 22. But the recovery in *this action* constitutes no part of the assets of the bank, but is a supplemental or superadded security for the benefit of the billholder—one which he is authorized to enforce in his own name, in an action of debt at law directly against the stockholder." (476.)

" After the *formal* dissolution of the corporation"—what did the Court mean by this word, *formal* which it italicised? Did it not mean, the sort of formal or partial dissolution di-

rected by the Act of 1842? We are bound to suppose, that it meant a sort of dissolution, like that which existed in the case it was deciding, and that, was the dissolution directed by the Act,—provided, the judgment declaring the dissolution, was in accordance with the Act, or, if not in accordance with the Act, was void for the difference. The judgment was not in accordance with the Act; it was a judgment of substantial and total dissolution, and thus, it was not in accordance with the Act. But this Court has held, (I dissenting,) that the judgment was void for the difference, or, was to be construed as not differing from the Act. 19 *Ga. R*. 337.

I think, then, that we are authorized, if not required to say, that the Court meant by the expression, "the *formal* dissolution of the corporation," the sort of dissolution directed by the Act of 1842, which, as we have seen, was no dissolution at all.

If this was the Court's meaning, then we may say, that the Act of 1842, was the ground of the decision.

Another reason for saying this, is, that in subsequent cases, the Act is more distinctly made the ground of the decision, as we shall see. (11 *Ga.* 492; 19 *Ga.* 347-354.)

So much then, for the first of the decisions. It is seen to be a decision which was made in a case differing, essentially, from the present, and which was put as far as appears, on that very difference.

Only two Judges, (Judges Lumpkin and Nisbet,) sat in the case; and against those two, was the opinion of the Court below.

The *next* of the decisions, is that made in *Hightower vs. Thornton*, (8 *Ga. R.* 486.) There is much less analogy between that case and the present, than there is between the last case and the present.

The facts were these. Hightower had a judgment against Thornton, a stockholer in this bank—a judgment founded, not on the bills of the bank, but on a certificate of deposite of

the bank. The bank was insolvent, and Thornton owed it a part of his subscription for stock. Hightower brought a bill against him, alledging these facts, and also alledging, that the charter of the bank, had been forfeited by a " decree" of the Court, and praying that Thornton might be compelled to pay up the unpaid part of his subscription, and that the money thus paid up, might be applied to the satisfaction of the judgment.

Now here, the dissolution was not a dissolution by expiration of charter, but was the very same dissolution as that in the last case, viz; a dissolution by " decree"—by judgment of the Court, and, therefore, was a dissolution affected in the same way, by the act of 1842, as, that was.

In this respect, then, there is precisely the same want of analogy between the case and the present case, as there was found to be, between the last case and the present case.

But this is far from all. The bank had, previous to the " decree" of forfeiture, made " an assignment of all its property real and personal, and all its debts, credits, and effects, to trustees, for the benefit of all its creditors and stockholders;" and the legislature had declared, that this assignment was to "be taken, held, and considered, valid for all purposes, both in law and equity." *Cobb* 121.

This assigment, then, conveyed to the trustees all the property, and all the debts, credits and effects, belonging to the bank, and thus placed them where they could not be reached at all by any dissolution of the bank, even one, the most total and absolute. Therefore, if the unpaid subscriptions made a part of the property, or of the debts credits and effects, belonging to the bank, the assignment conveyed those unpaid subscriptions, to the trustees, and thus placed them entirely beyond the reach of any dissolution of the bank, even a dissolution the most total and absolute.

Now, the decision of the Court was, that the unpaid subscriptions did make a part of the property of the bank—that they were " a trust fund for the payment of the debts," of

the bank.   (503.)   Consequently, the Court must have held, that they went, with the rest of the property, debts, credits, and effects, to the trustees, and thus, got beyond the reach of a dissolution of the bank.   Accordingly, the direction the Court gave to the case was, that the unpaid subscriptions must be sued for, in the name of the trustees or assignees.

The Court having made this decision, put the question of the effect of the judgment of forfeiture on the debts due to and from the bank, entirely out of the cases; for, according to the decision, the unpaid subscriptions had ceased to be debts belonging to the bank, when the judgment was rendered, and had then become debts belonging to the trustees, in trust for the creditors and stockholders.

In this second respect, then, there is, if possible, a still greater want of analogy between the case, and the present case, than there was found to be between them in the first respect.

Now, it must be manifest, that where there is such a want of analogy between two cases, as there is between these two, no argument can be made from the one to the other.

This case of *Hightower vs. Thornton* was decided at the same term as the last case; and the same two judges presided in it, and the decision had against it, the opinion of the same lower Court.

So much for the second of the decision.s

The next of the decisions is that in *Thornton vs. Lane* (11 *Ga. R.* 459.)

In that case, the action was against Thornton, a stockholder of this bank, on the same 11th section of the charter of the bank; and one of the defences was, the forfeiture of the charter by judgment of the Court.

Here again, is the very same dissolution that there was, in the two former, cases, viz; a dissolution by judgment, not by expiration of the charter.   Consequently, this case falls, in this respect, as much within the act of 1842, as those two did, and therein, differs, as they did, from this case.   And

the Court makes the difference a ground, if not, the ground, of its decision.   The Court says :

" Why so much time and talent, labor and learning, have been employed to establish a proposition which nobody de-. nies, viz: that the debts of a corporation, either to or from it, are extinguished by its dissolution, I am at a loss to compre- hend.   Certain it is, that it was recognized by this Court at this place two years ago, as it had been on more than one occasion previously."

" In *Hightower vs Thornton and others* (8 *Ga. R.* 4 86,) this Court says, upon the threshold of this argument, we are met, with the common law principle, that upon the dissolution of a corporation, all the debts due to it and from it, are extin- guished.   A doctrine which results necessarily from the fact, that the corporation having expired, whether by its own lim- itation, by surrender, abandonment of its members, or judg- ment of dissolution, there is no one in law to sue or be sued."

"That this doctrine is " *odious*" is evidenced by the fact, that a majority of the American States have already by their "enlightened legislation" " interposed to prevent, to ward off the iniquitous consequences" of this common law rule, the existence off which, I take it upon myself to affirm, is " a dis- grace to a civilized State."   Georgia is not obnoxious to this reproach, as far as this corporation and others in its vicinity, *in pari delicto*, are concerned.   She has made ample provis- ion to rescue *them* from the operation of this rule.   Such be- ing the rule however, and the foundation of it, this Court does not feel itself called on to extend it one jot or title, be- yond the reason which gave it birth."   *Ib* 492.

" Georgia" " has made ample provision to rescue *them*," (this bank being one of them,) " from this rule."   This, is as much as to say, that, but for this " provision," they would have been subject to the rule, and, therefore, it is making this " provision" the very ground of the decision.   What " pro- vision" was this?   Doubtless the Act of 1842, which declares, as we have seen, that " the judge shall pronounce the judg-

ment of the dissolution of said corporation for all purposes whatsoever, saving and excepting as to its power in · its corporate name, to collect and pay its debts and to sell and convey its estate real and personal" (*Cobb* 118.) But in this Act, is nothing about dissolution from expiration of charter. Georgia has made no " provision" "to rescue" a corporation dissolved by expiration of charter, from " the common law rule." That corporation, then, is still subject to the rule.

The case, then, stands on precisely the same footing as that of *Lane vs. Morris,* the first of the two already considered. And so thought the Court itself, for they say ; " We are content, therefore, after the most mature reflection to reaffirm merely on this point the views which we expressed when it was first presented for our consideration, in *Lane vs. Morris*," &c.

I pass to the next case, which is the *Bank of St. Marys vs Clayton. (12 Ga. R.* 475.) This, it is true, is not a "bank case," but it is a case, for all that, much more like the present, than are any of the " bank cases" which I have noticed.

"This was an action brought upon the information of Philip A. Clayton, against the Bank of St. Marys, for the recovery of the penalty imposed by the Act of 1835, for the issuing of change bills." After the commencement of the suit, but before judgment, the Legislature repealed the Act of 1835. One of the provisions of the Act of 1835 was, that "Any bank or body corporate or person or persons whomsoever, offending against the provisions of this Act, shall forfeit for each offence the sum of $500, to be recovered and applied as provided for by the second section of the Act hereinbefore recited." That section was as follows: " Any bank or corporate body, or person or persons whomsoever, offending against the provisions of the first section of this Act, shall forfeit the sum of one hundred dollars, to be sued for in the name of the State by any licensed attorney, on the application of any informer cognizant of said offence, who shall be a competent witness on the trial, and recovered by an action of debt or

on the case, in any Court of competent jurisdiction in this State, with full costs; one-half whereof when recovered, shall be paid to the use of the State, and the other half to the use of the informer."

The penalty is "to be sued for," "on the application of any informer." Of course, then, the right *to sue* for the penalty, and by the suit, to recover the penalty, is to vest in the informer. True, the Act says, that the money "when recovered," is to be paid, one-half to the State, and the other half to the informer; but this is not saying, that the right to these halves, respectively, is not to vest before the recovery. The time when money is to be paid, is no test of the time, when the right to the money vests. *Debitum in presenti, solvendum in futuro*, is a common case. Suppose this penalty paid after suit, but before recovery, would not the informer be entitled to one-half of it? Surely he would.

Under this Act, then, the right to sue for the penalty, vests in the informer. Clayton, the informer's, suit, was in the assertion of this right, and whilst the suit was pending, the Legislature repealed the Act. In the present case, the charter gave Beall the right to sue Robison, as a stockholder; his suit was in the assertion of that right, and whilst the suit was pending, the charter expired. Here is analogy.

What was the decision?

Let the words of the Court answer.

"But the main question in this case is, whether any judgment can be rendered in an action founded on a penal statute, after its repeal."

"We are clear, both upon principle and precedent, that a penalty cannot be recovered after the expiration of the law which imposes it, either by its own limitation, or a repeal by the power which enacted it, without an express provision to that effect, in the repealing statute; and that it makes no difference whether the penalty, when recovered, goes entirely to the public or to the informer, or whether, as in this case, it is divided between them." 12 *Ga. R.* 481.

Many cases are cited, sustaining this position. Of these, I will refer to but two, one, decided by an English Court, the other, by the Supreme Court of the United States.

The former is thus stated in the decision: 12 *Ga.* 485.

" Under the insolvent debtors act, (1 *George* III,) one Miller was compelled, by a creditor, at the *sessions at Guildhall,* to give up his effects, and he accordingly signed and swore to his schedule. But some circumstance arising, the Court adjourned his discharge till the next sessions. In the mean time the statute 2 George III passed, which repealed the compelling clause. Motion for a *mandamus* to the justices now to proceed to grant Miller his discharge, the jurisdiction having attached before the clause was repealed. But by the Court: Nothing is more clear, than that the jurisdiction is now gone, and that we cannot grant any such *mandamus.* Even offences committed against the clause (while in force,) could not have been now punished without a special clause to allow it; and therefore a clause is inserted in the repealing statute for that purpose. 1 *W. Blackstone's Rep.* 451."

In this case, the insolvent debtor had given up his effects, had signed his schedule, and had sworn to it; had done all that he was to do. But he had not obtained his actual discharge. The Act giving him the right to the discharge, was repealed. The Court held, that the right went with the statute giving it.

The latter of the two cases, is thus stated in the decision ; *Id.* 493.

" The same doctrine is enforced in the recent case of *Norris vs. Crocker et al.* 13 *Howard's U. S. Supreme Court Rep.* 434. And as this case covers all the points made upon this record to the fullest extent, I felt strongly inclined to rest our judgment upon its authority alone."

"It was an action of debt, brought by the owner of a fugitive slave, to recover the penalty of $500, under the Act of 1793, against the defendants, for harboring his slave. While this suit was pending, the Act of 1850, was passed, known

as the fugitive slave law.   Defendant pleaded as a defence that the Act of 1850, repealed by implication the Act of 1793, and consequently, abated the suit.   The Court held that the Act of 1793, was repealed by implication; and then used this strong language:"

"The next question referred to us for decision, presents no difficulty.   The suit was pending below when the Act of September, 18, 1850, was passed, and was for the penalty of $500, secured by the 4th section of the Act of 1793.   As the plaintiff's right to recover depended entirely on the statute, its repeal deprived the Court of jurisdiction over the subject matter; and, in the next place, as the plaintiff had no vested right in the penalty, the legislature might discharge the defendant by repealing the law.   We, therefore, answer to the second question certified, that the repeal of the 4th section of the Act of 1793, does bar this action although pending at the time of the repeal."

Here, the U. S. Court say, "As the plaintiff's right to recover depended entirely on the statute, its repeal deprived the Court of jurisdiction of the subject matter;" so, I say, in the present case, that the billholder's right to recover, depended entirely on the charter, and, therefore, that the expiration of the charter, deprived this Court of jurisdiction over the subject matter.

These two cases, as well as the principal case, itself, were cases in which, that on which the right depended—the statute—died by repeal—a sort of death to take men by surprise; the case in hand, is one in which, that on which the right depended—the charter—died by the expiration of the originally allotted term of its life—a sort of death for which men might be prepared, this term of its life being a thing known to all men.   Consequently, there is less interference with "vested rights," to hold, that in the latter case, the right died with that on which it depended, than there is, to hold, that in the former cases, the right died with that on which, it depended.

XXVI.— 4

It is true, that in the principal case, the right was a right to a penalty. But what is the difference between the case in which, the right is a right to a penalty and the statute giving the right has ceased to exist, and the case in which, the right is a right to a suit against a stockholder and the charter giving the right has ceased to exist? None, I say. There can, no more, be anything in the latter right, to enable it to survive its cause, than there is in the former right, to enable it to survive its cause. Equally, in both cases, the cause of the right ceasing, the right itself, the effect, must also cease. It may be true, that a charter will not, so readily cease to exist, as will a statute giving a penalty; it may be true, that there is no legislative power to repeal a charter, when there is such power to repeal a statute giving a penalty—but yet if, by any means, the charter does cease to exist, it surely is as dead, as the statute is, when it ceases to exist. Now, in the present case, there can be no doubt, that the charter did cease to exist; it expired by its own limitation. Then, there can be no difference, between the two cases.

And in each case the right was a *chose* in action—was but a right to sue. When the crime was committed, the informer acquired the right to sue the criminal; when the bank failed, the billholder acquired the right to sue the stockholder. The two rights were precisely alike, with respect to the degree of their perfectness. Therefore, if it be true, that the nformer's right was " inchoate," so, equally, must it be true, that the bill holder's right was "inchoate."

I remark, that the repealing Act contained a provision remitting the penalties incurred under the repealed Acts; but the Court makes no use of this provision; the Court puts its decision, exclusively, on the repealing provision; and well it might, for the two provisions include each other. To repeal a right, is to remit the corresponding liability; to remit a liability, is to repeal the corresponding right. And so, to repeal the right to these penalties, was, to remit the liability to pay

Robison vs. Beall.

the penalties; to remit the liability to pay the penalties, was, to repeal the right to the penalties.

The English case, however, was not the case of a right to a penalty. It was the case of a right to a discharge under the insolvent laws—a right that commends itself to favor, (our Constitution and laws being the judge,) as much as any right can.

This case of the *Bank of St. Marys vs. Clayton*, and the two cases cited from it, and, I may add, the other cases in it, are, then, all similar to the present case, in every essential particular; and the decision in it, and the decisions in them, were, *not against*, but, *for*, the proposition, that, when a charter expires, the rights depending on it also expire. If, therefore, contrary to what I have supposed, the intention of the three former decisions, was, not, to put themselves upon the special law of 1842, which directed only a "formal" or partial dissolution, but was, to deny this proposition, then with them, comes in conflict this later decision, and all those decisions on which it rests.

I pass to the next decision, that made in *Moultrie vs. Smiley*, 16 *Ga.* 289.

In that case the action was against the *Directors* of the Commercial Bank of Macon, and was founded on that provision of the bank's charter, which makes its directors liable for any "excess" of indebtedness in the bank, beyond "three times the amount of their stock paid in, over and above the amount of moneys actually deposited in their vaults, for safe keeping."

The defence was, that pending the suit, the charter had expired.

The case, then, is like this, except, that this is against a stockholder, while it was against directors.

The decision was, that the defence—the expiration of the charter—was not a good one; but the decision was not unanimous, I dissented from it.

The difference between the case and this case, in the view which I took of the case, is not material; but, in the view which the other two members of the Court, took of the case, that difference is, perhaps, to be considered material.

They seemed to think, that the liability of a *director*, is primary and *independent*, not secondary and dependent, like the liability of a stockholder, which is only ultimate.

Lumpkin J. says, "I am not prepared to say, that the directors in this case, who were guilty of the mismanagement, would not be individually liable to billholders, independent of this statutory provision." *Id.* 317.

Again, "who is the obligor and obligee, the promissor and promissee, under the 8th rule? Is it not the directors, under whose administration the excess was committed, on the one part, and the billholder on the other? What is it to them that the charter of the Commercial Bank of Macon, expired on the 1st day of January, 1852." *Id.* 317.

Again, "For *quoad hoc* they" (the directors) "are the body, and the corporation but the limbs. They are the head and front of this offending." *Id.* 320.

Again, "So, then, to make the definition from Burrill available, it should have been reversed. The legal maxim is, *Accessorium non ducit sed sequitur suum principale.* That the incident does not lead, but follows the principal. Whereas, here, the extinguishment of the collateral is made to work the extinguishment of the direct liability. In this instance, neither controls, but the one is wholly independent of the other." *Id.* 321. *Wholly independent* of the other, is a strong expression.

Again, "This suit is brought to enforce a distinct, separate and independent undertaking." *Id.* 323.

*Distinct, Separate and independent,* are words quite as strong.

Now if one liability is "wholly independent" of another— if it is "distinct, separate and independent" of another, it certainly is true, that it cannot be affected by anything whatev-

er, that may happen to the other; and, therefore that it cannot be affected, by the extinguishment in any mode, of the other.

Judge Starnes seems to have entertained the same view. He says, " what show of reason is there in the proposition, that because the charter of the bank has been forfeited, and *its* debts are in this way extinguished, although this excess has never been paid, yet that no recovery can be had for and on account of it, against these defendants, who are severally and independently liable to pay it?" *Id.* 332.

Again, " The right to hold these directors responsible, cannot be said to depend alone, on the contract between the State and the corporators, but springs out of the statutory liability of these defendants, which, if not *ex contractu* is *quasi ex contractu*, and was incurred by each director when this excess happened." *Id.* 333.

It is not then, perfectly clear, that even this decision means to say, that the liability of a *stockholder*, which is only ultimate, and which is not independent of the liability of the bank, is not extinguished by the expiration of the charter. At most, however, it was but the decision of two, out of the three, members of the Court, the opinion of the other member being, that the liability expired with the charter.

I pass to the next of the decisions, that made in *Robison vs. Lane*, 19 *Ga. R.* 337.

That case differed from this only in one particular. The defence in it, was, a *judgment* of forfeiture of the charter; in this, the defence is, the *expiration* of the charter.

The Court was requested to charge, that if the charter "was absolutely and unconditionally forfeited, without reservation of the rights of plaintiff, and without retaining and continuing the liabilities upon the defendant, then all the debts due to and from said bank became extinguished." The Court refused so to charge, and that refusal made the question for this Court.

The decision of this Court, (I dissenting,) was, that the Court below was right in its refusal.

The main, I think I may say, the only, ground on which Lumpkin J. put his opinion, was, the same old ground existing in *Lane vs. Morris, Hightower vs. Thornton, and Thornton vs. Lane*; viz: special legislation—the said act of 1842, with the kindred acts of 1840, 1841, and 1843.

He says, "In *Thornton vs. Lane*, (11 *Ga. R.* 493,) in speaking of the odiousness of the old common law rule, that upon the dissolution of a corporation, the debts due to and from it are extinguished, and which, thank God, I have lived to see itself *extinguished*, by an authority not subject to review, I remarked, that 'Georgia is not obnoxious to this reproach so far as this corporation,' (the P. & M. Bank of Columbus,) 'and others in its vicinity *in pari delicto*, are concerned. She has made ample provision to rescue *them* from this rule.'"

"Let us glance for a moment at some of the enactments on this head."

He then gives the material parts of the Acts of 1840, 1842, and 1843, quoting that part of the Act of 1842 which required, that "the Judge should pronounce the judgment of dissolution for all purposes whatsoever, saving and excepting, as to the power in its corporate name, to collect and pay its debts, and sell and convey its estate real and personal." And then he exclaims, "And yet in the face of all this legislation and of this assignment by the bank, before its charter was forfeited, and of the legislative confirmation thereof, it is insisted that the liabilities of this corporation, and consequently, the personal liability of the stockholders, is extinguished! and wherefore? Suppose, it be true, that the debtors of the bank and the stockholders contracted in reference to the common law rule? Is it not equally true, that they contracted also in reference to the acknowledged right of the legislature to rescue the assets from this principle? And is not the one to be taken as much an element of the contract as the other.?" *Id.* 347–8–9

Again, he says, "Suppose it be. true, that apart from the Acts of 1840, 1841, 1842 and 1843, the debts due to and from the bank would have perished with the corporation, how can it be pretended that they are not saved by the statutes." *Id.* 350.

And what is here said by Judge Lumpkin, shows that the view which I have taken of *Lane vs. Morris, Hightower vs. Thornton, and Thornton vs. Lane,* viz: that they were put upon these same statutes, is the true view.

It is true, that Judge Lumpkin says, (347,) "my mind has never wavered for a moment upon this question," (that of extinguishment.) "Whether considered upon general principles or upon our own special legislation relative to the subject;" but he does not state the general principles to which he refers, and he does state very fully the "special legislation relative to the subject." At any rate, the special legislation was there to be relied on, whilst it is not here to be relied on. Besides, he only speaks in the first person.

Judge McDonald also, had special grounds. He considered the case essentially different from the present, and rested his judgment, exclusively, on that difference. Had the case been, like the present, on the expiration of the charter, his judgment would have been, the opposite of what it was. He said, "I have no doubt, that, according to the common law, on the civil *death* of a corporation its debts are extinguished, and I have as little doubt that the legislature has power to prevent that effect. A corporation is factitious; and if the power which creates it, in the act of its creation, or by subsequent constitutional enactment, makes no provision for preserving and continuing the debts due to and from it, on its absolute dissolution, they perish with it—they become extinct."

"If the charter of the Planters and Mechanics Bank was repealed or annulled, and the corporation was absolutely dissolved thereby, unless they have been prevented by compe-

tent constitutional legislation the consequences ensue to which I have adverted." *Id.* 354.

This decision, then, is really a decision in *favor* of the proposition, that when a charter *expires,* the rights depending on it expire too.   Two Judges, at least, expressly sanctioned that proposition.    And as for the third, he thought the case *rescued* from the common rule, by special legislation— legislation which, as he conceived, prevented a *dissolution,* (an expiration) of the charter.

The dissenting Judge thought, that, as the judgment was in terms, ₌one of absolute and unconditional forfeiture and seizure of all the franchises, including " *that of being a body corporate,*" its effect was, of itself, to dissolve the corporation; that, even if it was erroneous, yet, that it was binding until set aside, especially as it had been acquiesced in, for twelve years.

I pass, then, to the next and last of the decisions, that made in *Moultrie vs. Hoge,* (21 *Ga. R.* 515.)

That was a case in which, the persons sued, were *directors* in the Commercial Bank of Macon.   The defence was, the expiration of the bank's charter.

The case, then, was like this, with the exception, that in this, the defendant is a *stockholder,* not a director.

The decision was, " that by the expiration of the charter of said bank, the ' cause of action became extinguished.' " Lumpkin J. dissenting.

This decision, then, *supports* the proposition, that when the charter expired, in the present case, the liability of the stockholders also expired.

To sum up, the question is, Is it true, that the decisions of this Court are opposed to the proposition to which I came as a conclusion, viz: That when this charter expired, the liability of the stockholders expired with it.

Three of the cases, *Lane vs. Morris,Hightower vs. Thornton, and Thornton vs. Lane,* were cases in which, there was no expiration of the charter at all, but only a judgment of for-

feiture; and there was a special law which directed that this judgment should not extend so far as to deprive the bank of the power, in its corporate name, to collect and pay its debts, and sell its property; that is, which directed, that the judgment should not dissolve the bank. This law, the Court thought, was operative and prevented the judgment from dissolving the bank. The decisions were, that the liability of the stockholder was not extinguished. These, then, are not decisions, that this liability would not have been extinguished, if the bank had, really, been dissolved. But in the present case, the bank was, really, dissolved, its charter had expired.

These three decisions, then, are not decisions in opposition to the proposition, which is, that when the charter' expired, (a thing which *dissolved* the b ink,) the liability of the stockholders also expired. They are decisions which do not touch that proposition. And the decisions themselves, not being in opposition to the proposition, it would make no difference, even if they were accompanied by some expressions denying the proposition, for, in such a case, the expressions would be mere *obiter dicta;* but indeed, the expressions which do accompany the decisions, are such as to justify us in saying, that the decisions were actually put, in great part, if not wholly, on the special law.

In one of these three cases, there was also, the assignment, and the law making it valid; and that was, itself, a decisive matter in the case.

These three decisions, then, count neither way.

Another of the cases, that of *Moultrie vs. Smiley,* was a case against *directors,* and though the Court decided, that the liability was not extinguished, yet, in doing so, it laid great stress on the ground which it took, that the liability of directors, is, distinct, separate, independent, primary. But the liability of stockholders, is only ultimate. It is not quite clear then, that even this decision ought to count as a decis-

ion in opposition to the proposition, that when the charter expires, the liability of the stockholder also expires.

Let it, however, be so counted. Then there is one of the decisions against the proposition; a decision, however, weakened by being dissented from by a third part of the Court.

Another of the decisions, that in *Robison vs. Lane*, made by two Judges against one, was, that the liability of the stockholders, was not extinguished, notwithstanding the judgment of forfeiture; but, there was in the case, the special law of 1842, as, in the first three cases; and, on that law, one of the two concurring Judges, in great part, if not wholly, put his opinion; and the other of the two put his opinion on the fact, that the judgment had not been *executed*, at the same time, saying, that if the case were one in which, the charter " was repealed or annulled, and the corporation was absolutely dissolved thereby," the liability would be extinguished. The third Judge thought that the judgment did dissolve the corporation and, therefore, that the liability was extinguished. This, then, is a decision which may be counted in favor of the proposition.

The same may be said of the decision in the *Bank of St. Marys vs. Clayton*, a decision, that when a statute giving a penalty is repealed, the penalty perishes. And this decision stands on many others, each one of which, has an independent value of its own. This, (throwing away these others,) makes two, in favor of the proposition.

The last of the decisions, that in *Moultrie vs. Hoge*, was, that when a charter expires the liability of the directors expires. But if the liability of the directors expires, at least as much, if not more, expires the liability of the stockholders, for that, beyond a doubt, is only ultimate. From this, one Judge dissented.

This makes three in favor of the proposition.

Thus then, of the seven decisions, three count neither way, one counts against the proposition, and three count in favor of it. And of these three, one dates before, and two date af-

ter, that adverse one, so that it finds itself between the upper and the nether millstone.

It turns out, then, not to be true, that the decisions of this Court, are in opposition to the conclusion, that when this charter expired, with it expired the liability of this stockholder.

Did *stare decisis* require, that these two decisions should not depart from their immediate predecessor? If it did, it equally required, that that should not depart from its immediate predecessor? Unless, *stare decisis* is to be applied, or, not applied, according to the side it favors.

I proceed to the second question.

Suppose it true, that the three first decisions, *Lane vs. Morris, Hightower vs. Thornton, and Thornton vs. Lane,* as well as the fifth, *Moultrie vs. Smiley,* are to be counted as adverse to the proposition, that when this charter expired, with it expired this stockholder's liability; and suppose the other two decisions, *Robison vs. Lane, and Moultrie vs. Hoge,* not entitled to be counted at all; then, is this Court bound by the maxim, *stare decisis,* to follow the four decisions? That is the next question?

Is a Court bound to follow every decision? If so, Courts have, from the beginning, been constantly failing to do, what they were bound to do. They have, again and again, time out of mind, overruled cases. There is now, a volume of these cases. The process still goes on, every where. It wont do to say, then, that a Court is bound to follow *every* decision.

Which decisions are they, then, that it is not bound to follow?

In my opinion, they are they, which are *clearly* contrary to law; especially, if, also, they are recent; are adverse to the current of legal opinion; and, if they betray marks of great repugnance in the Court making them, to the principle which they go to condemn. If it is not *clear,* that the decis-

ion is contrary to law, the decision ought, I think, to have the benefit of the doubt, and so, ought to be followed.⁴

But, when a decision is clearly contrary to law, then, a Court ought not, I think, to follow it; for, if, when that is so, a Court follows it, the Court violates the Constitution of the State, and, if the decision be of a particular kind, and the case one happening anterior to it, violates, also, the Constitution of the United States; and, after all, does more harm than good.

When the Court follows a decision that is contrary to law, it turns that which is contrary to law, into law. This, is to make law. Therefore, the Court makes law. But the power to make law, is a power properly attached to another department of the State government, the legislative department; and the Constitution of the State says : that no Court "shall exercise any power properly attached" to another department of the government. Therefore, when the Court follows a decision that is contrary to law, it violates the constitution of the State. (Art. 1, Sec. 1.)

This is not all. The law thus made by the Court, is of a peculiar character; it works backwards as well as forwards. Why backwards? Because the Court, that which is to work it, regards it, not as a law made by the Court, and dating, therefore, from the decision, but, as a law made by the legislature, and dating from some time anterior to the decision, and merely declared by the decision. Consequently, the Court has to apply it to all cases happening after this anterior time, not even excepting those happening before the decision. And thus, it is a law that works backwards as well as forwards.

Now, suppose the decision be one, increasing the weight of some penal law, or one lessening the weight of some law of contract; suppose, for example, the decision be that death is the punishment for manslaughter, or, that six per cent. is the interest for lent money. Then, the decision, if, the former, and applied to a case happening previously to it, would

be an *expost facto* law; if, the latter, and applied to a case happening previously to it, would be a law impairing the obligation of contracts. And the constitution of the United States declares, that no State ever shall pass any *expost facto* law, or law impairing the obligation of contracts. Therefore, if a Court follows the decision, in either of these cases, it violates the Constitution of the United States.

But even were the two Constitutions out of the way, yet, if a Court follows a decision which is contrary to law, it does more harm than good.

In every instance in which, a Court follows a decision that is contrary to law, it divests vested rights. This, in the cases which happened previously to the decision, is an enormous wrong and hardship. The sufferers are men, not only innocent, but, positively meritorious—men who have kept what was really the law, and who could not foreknow, that a decision would come along, and say, that it was not the law, and yet, they are treated as law breakers and wrong doers.

And this is a mischief not to be compensated for, by any good that can come from following the decision. What good can come from following the decision? Men have regulated their conduct by it? If the decision be clearly contrary to law, men will be chary of regulating their conduct by it; they will distrust it, and provide against it. Suppose a decision, made, that a will, or a deed, without a witness, is valid, how many men would follow it? Very few, if any.

The number, then, that will regulate their conduct by a decision that is clearly wrong, will be few; and they, we may assume, will consist of the careless, or the speculating classes, neither of which are entitled to much favor. Especially, must this be true, if the decision be recent; if it be adverse to the current of opinion among lawyers; and, if it betray marks of great repugnance in the Court making it, to the principle which it denies. Now, surely, the good of upholding a small number of such men as these, is not a compensation for the evil of overthrowing such men as those

first adverted to. But, even, if this number were greater, there is nothing to exempt them from a principle which is applicable to other men—the principle that all are bound to know the law. What answer then, could they return to the question—Did you not know, that a Court cannot make a law? None.

For these reasons, I think, that a Court is not bound, to follow such a decision.

The question, then, is, if the four decisions now in question, were, as I am assuming them to be, all adverse to the proposition, that when this charter expired, with it expired the liability of the stockholders, is it true, that they would be clearly contrary to law? I think it is.

To deny, that this liability expired with the charter, is to deny, that the things which depended on the charter for their existence, expired with it; and to deny this, is to deny, that when the cause ceases, the effect ceases; and if to deny, that when the cause ceases, the effect ceases, be not, clearly, contrary to law—to every law—I cannot conceive what would be.

This view, of itself, would be enough. But to deny this proposition, is to deny the authorities; is to deny the *Bank of St. Marys vs. Clayton,* and the many cases on which it rests; and, indeed, so far as I know or believe, every other case. As far as I know and believe, there is not one single case, that would support these decisions in denying this proposition.

There is no special Act which comes in, and saves the liability of *stockholders* from extinction.

But, referring to what I have said on this proposition, in the early part of this opinion, and, to my opinions in *Moultrie vs. Smiley,* (16 *Ga.* 340, *et seq.*) and in *Robison vs. Lane,* (19 *Ga* 380, *et seq.*) I forbear.

Are the decisions recent? Quite so. The oldest was made in 1850, the youngest in 1854. We may almost say, *res adhuc sub judice.*

Would the decisions, if such, as I am now assuming them to be, have against them, the current of opinion among lawyers? They would, from the best information I have.

Do they betray marks of great repugnance to the " common law rule," that when a corporation is dissolved, the debts due to and from it, are extinguished? Very great, I think.

In *Hightower vs. Thornton*, there is quoted with approbation, the remark of Chancellor Kent, made as counsel, and in extreme age, "that to permit the odious and obsolete doctrine of ancient date, before moneyed institutions were introduced, to be now applied to the dissolution of a bank, perhaps by its own mismanagement and abuse, so that all its assets were to be considered as dispersed to the winds, without any owner or power any where, to collect them, and justly apply them, *would be a disgrace to any civilized State.*" 8 *Ga.* 493. And no reference is made, to the above quoted antagonist doctrine promulgated by the Chancellor, as a teacher of law in his Commentaries. (*Supra and 2 Kent's Com.* 307.)

In *Thornton vs. Lane*, the doctrine is characterized, as, "odious;" and then, is added, this remark; "the existence of which" (the doctrine,) "I take it upon myself to affirm, is a "disgrace to a civilized State :" and, in another place, this remark; " the very idea is abhorrent to every principle of justice." 11 *Ga.* 492, 6.

In *Moultrie vs. Smiley*, it is said, that, " the rule itself has been justly characterized, by the most enlightened tribunals, as, odious and iniquitous." 16 *Ga. R.* 294. And again, "it is the duty of Courts, to put the most liberal construction upon these charters, and to struggle hard to get away from the common rule, so far as creditors are to be prejudiced by it." *Id.* 330.

Surely, here is exhibited, a degree of aversion to "the common law rule," so great that it, really, ought to warn us to distrust the decisions, which were adverse to the rule.

Now, is it likely, that many persons would regulate their conduct by such decisions? I think not. There is no evi-

dence in this case, that any man ever did buy a single bank note, in consequence of the decisions. For ought that appears, all the notes of the bank were, even before the first decision, in the same hands in which, they now are. Certainly, there is no evidence, that Beall, the plaintiff below, did not have his bank notes, when the bank broke, long before the decisions.

If then, the decisions are departed from, as contrary to law, who will have been misled to their loss, and therefore, who will have the right to complain? There is nothing in the case, to warrant the belief, that a single person will have been.

On the other hand, if the decisions, being contrary to law, are not departed from, the effect will be, to divest all the men, women and children, that ever held stock in the bank, of valuable rights which the law gave them, and which were "nominated in their bond;" in a word, will be, to make them sufferers for trusting themselves and their property to the law itself.

*I* should say, then, that these four decisions ought to be departed from, even, if it were true, (as it is not,) that they are all adverse to the proposition, that when this charter expired, the liability of the stockholder expired with it; and were it also true, that the other two decisions opposed to these four, are entitled to no weight.

The Act of 1855—to preserve and dispose of, the property and effects of corporations after their dissolution, and to provide for the payment of the debts due by the same, was slightly referred to, by the counsel for the defendant in error.

But we all think, that there is nothing in that Act, to save the liability of *stockholders* from extinction. The Act says, that, "the debts due to and by the corporation"—shall not be extinguished. But it no where says, that the debts due from the *stockholders*, shall not be extinguished. When the charter expires, there is, therefore, nothing in the Act, to keep these debts alive.

And the purpose of the Act, seems only to have been, to preserve the effects of the corporation, and make them, a trust fund for its creditors first, and next, for its stockholders. To such an Act, there could be little constitutional objection by the corporation, itself, as such an Act would be better, perhaps, for the corporation, than " the common law rule." But, when it comes to the stockholders, the case is different. By the terms of the charter, as it was when they accepted it, their liability was to expire on the 1st of January, 1857, for the charter itself was to expire on that day. Is it in the power of the Legislature, to prolong this liability indefinitely ? The legislative interference in the Dartmouth College case, was as nothing, to what such a legislative prolonging of this liability, would be.

Hence it was, probably, that the Legislature failed to make the Act extend to the debt, or liability, of stockholders. Indeed, if the language used by the Legislature, were doubtful, here would be reason enough, to require us, to give the benefit of the doubt, to the construction, that would make the language fall short of this debt or liability.

There is yet another reason, quite sufficient, to make me think, that the Act does not apply.

The *judgment of forfeiture*, in my opinion, *totally* dissolved the bank. A part of that judgment, was, " that the liberties, privileges, and franchises, to-wit, those *of being a body politic and corporate*, be seized into the hands of the State." If this did not dissolve the bank, what judgment could?

It is true, that in this particular, the judgment exceeded the directions given in the Act of 1842 , but still, the case was one in which, the Court had jurisdiction, and when that is so, a Court's judgment though erroneous, must stand, until set aside. This is an every-day principle. Indeed, the Court, as I have heard, deliberately disregarded the direction in the Act of 1842, holding such direction unconstitutional— and, of set purpose, made the judgment, one of general and

total dissolution.   The error, then, if it is an error, I consider to stand on the same footing as the thousands of errors brought to this Court for correction, which, until reversed bind.   See my opinion in *Robison vs. Lane*, 19 *Ga. R.* 396.

This judgment, then, as I think, totally dissolved the bank.

This judgment was rendered in 1843, twelve years before the Act of 1855, was passed.

Now, that Act, by its terms, only applies to dissolutions " from and after the passage of" the Act.   The Act therefore, by its terms, does not apply to the dissolution of this bank in 1843.

I said in a previous part of this opinion, that I would here give my reason for thinking, that this Act of 1855, did not save the debts of even the bank itself, from extinguishment. I have now given that reason.   The debts were extinguished long before that Act was passed—were extinguished by this judgment of dissolution, rendered in 1843.   In that consists my reason.

[7.] Upon the whole, then, the conclusion to which I come, is, that the Court below should, as requested, have told the jury, that, with the expiration of this charter, expired, the liability of the stockholders.*

Judgment reversed.

*In answer to the objections made to my presiding in this case, I refer to my opinion in *Lane vs. Morris*, 16 *Ga. Rep. p.* 248.

McDONALD J. concurring.

This cause comes to this Court on many assignments of error.   The judgment is reversed on one of the assignments only, and that being fatal to the case of defendant in error, who was plaintiff in the Court below, other grounds which had not been affirmed, were not considered by us.   Some of them were not insisted on by counsel for plaintiff in error.

The counsel for defendant in the Court below requested the Court to charge the jury, that, if the charter of the Planters and Mechanics Bank expired by its own limitation, on the 1st of January, 1857, such expiration extinguished the plaintiff's debt, and that he cannot recover. The Court refused to give this request of counsel in charge to the jury, and the defendant assigned error on that refusal. A majority of the Court are of opinion that the request ought to have been given in charge to the jury, and, on that ground, reverse the judgment of the Court below. As a member of the Court dissents from the judgment rendered, it becomes my duty to deliver my opinion in writing, assigning my reasons for concurring in that judgment.

It is insisted that it has already been decided by this Court, that the personal liability of the stockholders in the Planters and Mechanics Bank of Columbus, survives the dissolution of the corporation, and that it is no longer an open question ; that the doctrine of " *stare decisis*" requires that that adjudication should be implicitly followed, and that it cannot now be called in question.

In the case of *Cain and Morris vs. Monroe*, 23 *Ga.* 87, I expressed my opinion on that argument. I there said it was the duty of an appellate Court, of the highest obligation, if by its decision, it has established, as law, that which, it becomes satisfied, is not law, to annul its error, &c. Such Courts are established, not to make, but to expound the law. If, in any case, it decides contrary to law, it substitutes error for law in that particular case, and if it adheres to it in subsequent cases, it establishes error as law. That would be a strange morality which would palliate error, and commend a perseverance in it, while it condemned a correction of it.

If it be allowable to maintain an erroneous exposition of the law, it is when it has gone forth with such authority, and has been of such standing, that the community, in all probability, have regulated their conduct and contracts by it. In such cases the Court having the power of reversal ought to

weigh well the consequences before it interferes, for if more mischief than good is to result from a change, and the error in the former adjudication is not most manifest and clear, it had better stand, however strong the inclination of the Judge's mind may be against it. No case precisely like the one now before us has ever been before this Court. The cases approaching it most nearly are *Moultrie et al. vs. Smiley*, 16 *Ga. Rep.* 289, and the case of *Moultrie et al. vs. Hoge*, 21 *Ga. Rep.* 513. These suits were both against directors of the Commercial Bank at Macon, for excessive issues of bank notes, during their directory, for which excess the charter made them liable. The charter expired during the pendency of the actions, and that matter was pleaded in the first action as an extinguishment of the demand, which plea was stricken out by the Court, and error was assigned thereon.

In the latter action, counsel for the defendant requested the Court to give in charge to the jury, the expiration of the charter, as an extinguishment of the plaintiff's demand. The Court refused so to charge, and error was assigned thereon. In the case of *Moultrie vs. Smiley* the judgment was affirmed. In the case of *Moultrie vs. Hoge* the judgment was reversed, overruling the other case. Those were cases against directors, and this is a case against a stockholder. There is a slight difference in the cases. If they were precisely parallel, the decision in the latter of the two cases would be a decision on the identical point now under consideration, and would render the assignment of reasons for the judgment in this case unnecessary. The cases which have been passed upon by this Court, in regard to the stockholders' liability under the charter of the Planters and Mechanics Bank of Columbus, after the judgment of forfeiture of the charter of that bank, cannot be considered as authority beyond the points made in· the record, and the decision thereof. It was insisted in those cases, that by that judgment of forfeiture, the corporation was dissolved, and the debts were thereby extinguished, and could not be collected from the stockholders. The Court decided

that the remedy of the billholder against the stockholder, survived the dissolution of the corporation, and that he might assert it both before and after its *final* dissolution. The language of the Court goes beyond the case made in the record, and would include a case of dissolution by the expiration of the corporation by its own limitation. It cannot be authority beyond the point the Court was called on to decide. *Thornton vs. Lane,* 11 *Ga. R.* 501.

I shall hereafter express my opinion of the difference of effect upon the corporation, its property and debts, between the judgment of forfeiture and a dissolution by the expiration of the charter.

Suffice it to say, now, that the decisions of this Court on this point, have not been made on the effect of a dissolution of the corporation by the expiration of the charter on the individual liability of its stockholders, but on the effect of the judgment of forfeiture of the charter on that liability.

I will now proceed to the consideration of the case as made in this record. The suit is on the charter. The plaintiff sets forth the provisions of the charter in respect to the liability of stockholders, alleges that he is a billholder, that he has sued and recovered judgment against the bank on the said notes, that he has had executions issued thereon, that the Sheriff has returned them " *nulla bona,*" and that an action has accrued to him against the defendant as a stockholder in said bank, &c. The charter has expired, and there is no provision therein for continuing the liability of the corporation or its stockholders, beyond the period of its existence.

Charters in this State are Acts of the Legislature, and when they fix a limit to the corporation which they create, they are necessarily temporary Acts, and unless they contain provisions for the continuance of their obligations, contracts and remedies, &c., after they cease to operate substantially for the purposes for which they were created, all the consequences ensue, which follow the dissolution of a corporation, at common law.

The Acts creating the Planters and Mechanics Bank of Columbus, declared that it should continue until the first day of January, 1857.

By the 11th section it is enacted, that "the persons and property of the stockholders shall be pledged and held bound in proportion to the amount of shares, and the value thereof, that each individual or company may hold in said bank, for the ultimate redemption of the bills or notes issued by the said bank, in the same manner as in common actions of debt, and no stockholder shall be relieved from said liability by sale of his stock, until he shall have caused to have been given, sixty days notice in some public gazette in this State." The charter does not declare that this liability shall extend beyond the expiration of the charter, as fixed in the Act of incorporation.  Shall it be so extended by the interpretation of the Act?  If there be nothing in the Act to justify it, I do not feel warranted in so expounding it.  This is not the case of the construction of an Act of the Legislature, according to its reasons and spirit.  That happens when a question arises whether a particular case falls within the reason and spirit of a statute, which is unquestionably in existence, and of full force and obligation, as to cases falling within its letter.  But the point here is, whether a temporary statute can be extended beyond the limit of its existence; and if some temporary statutes may be so extended, whether the statute under consideration is one of that description.  It is as well settled as any principle in the books, that if a penal statute be repealed, or expire by its own limitation, a person offending against its provision cannot be prosecuted and punished, unless there be some provision made in that or some other statute, authorizing it.  If judicial proceedings be begun under the Act, they cannot be pursued. 1 *Kent Com.* 465, *and notes; The Bank of St. Marys vs. The State,* 12 *Ga.* 575. So well is the principle understood in England, that Parliament expressly enacts sometimes, that the statute shall continue in force after it has ceased to operate substantially, for the purpose of supporting

Robison vs. Beall.

prosecutions against those who may have violated it during its existence. *9 Bac. Ab. new ed.* 223. There must be a reason for this rule, and the most satisfactory one is, that at the time of enforcing a right claimed under it, there is no law statute or common, to sustain it. If a statute giving a new right, creating a new liability, or imposing penalties for acts before innocent, expire or be repealed before the right becomes completely vested, the liability established and perfected by the final judgment of a Court, (and the same in regard to the prosecution for penalties,) so that the party complaining shall be compelled to resort to the repealed or expired Act to sustain his claim, there can be no law to support him. For if such an Act be repealed or expire, it is precisely in such cases as if there had never been such an Act. The case must fail.

The case of *Stevenson vs. Oliver,* 8 *Messon & Wellsby,* 235, furnishes an instance of a completely vested right under a tempory statute. That was an action on an apothecary's bill. The defense was, that the plaintiff was not a qualified apothecary under the statute, and could not therefore recover for services rendered. The plaintiff relied, for his authority to practice, on a warrant as assistant surgeon in the navy, which he held on the 9th of September, 1825. That, he contended, was sufficient under the statute of 6 *Ga. 4 c.* 133, *sec.* 4, which enacted that any person holding such warrant in the navy, army, &c., should be entitled to practice as an apothecary, &c. Against this, it was said he could practice but one year, as the 11th section of the statute enacted, "that this statute shall take effect from and after the passing thereof, and shall continue until the 1st day of August next, in the year 1826." It was held that although the Act was temporary, the right acquired under it was not; that the apothecary acquired a perfect right. By the Act, the right became perfect, and in suing for his apothecary's bill, all he had to do was to show he had a warrant as assistant surgeon in the navy. All that this

case establishes is, that a temporary statute may confer a perfect title.   Now, if the Act had entitled the plaintiff to a warrant in the navy as assistant surgeon, on certain terms prescribed in the Act, which he insisted he had complied with, and the persons having authority to deliver it to him, had refused to do it, and, in the mean time, the Act had expired, he could not have enforced the delivery, however unjustly and oppressively he may have been treated, because the statute on which he relied to enforce his right had expired.   That case proves another thing : that the Judges who decided it, considered the effect of the expiration of a statute the same in civil suits as in criminal prosecutions, though, singularly enough, they misstated the law in regard to its effect on crimes and penalties, unless there be some English statute which changes the law, as expounded by the ablest Judges in that country and in this.   We may probably infer that there are such statutes, from the authority in the 9th *Bacon*, to which I have referred.

If the plaintiff's right depend on the statute, and the statute has expired as to the bank, how can it exist as to the defendant, and entitle the plaintiff to recover against him ?

Without a provision to that effect in the charter, the existence of a bank cannot extend beyond the time specified in the Act of incorporation for any purpose, not even to save its debts from extinguishment, its personal effects from forfeiture, and its lands from reversion.   The effect of its dissolution, according to all law, is the extinguishment of its debts.   Mr. Kyd says, in his treatise on corporations, that "the effect of a dissolution of a corporation is, that all its lands revert to the donor ; its privileges and franchise, are extinguished ; and the members can neither recover debts which were due to the corporation, nor be charged with debts contracted by it in their natural capacities."   *2 Kyd Cor.* 516.   He expresses a doubt as to what becomes of the personal estate.   It is the debts, however, with which we have to deal.   The principle is expressly recognized by this Court in *Hightower vs. Thorn-*

*ton,* 8 *Ga.* 492. Judge Lumpkin in delivering the opinion of the Court expresses himself thus. "Upon the threshold of this discussion, we are met with the common law principle: That upon the dissolution of a corporation the debts due to, and from it, are extinguished. A doctrine which results, necessarily, from the fact that the corporation having expired, whether by its own limitation, by surrender, abandonment of its members, or judgment of dissolution, there is no one in law to sue or be sued."

Again in *Thornton vs. Lane* the same learned Judge delivering the opinion of the Court remarked, " why so much time and talent, labor and learning have been employed to establish a proposition which nobody denies," viz : " That the debts of a corporation, either to 'or from it, are extinguished by its dissolution, I am at a loss to comprehend. Certain it is, it was recognized by this Court at this place, more than two years ago, as it had been on more than one occasion previously." There is nothing in the charter of this bank to a ert these consequences on its dissolution by its expiration. It was the law of the bank on the day it was organized, and if no subsequent act saves the debts from extinction, they are gone to all intents and purposes. However unreasonable and unjust it may be, such is the law, and those who administer it are bound so to expound it. Such was the effect of the expiration of the charter upon the debts of the bank, so far as the bank as a corporate body is concerned. It follows as a sequence that the liability of the stockholders for the debts is gone also, unless the statute declare otherwise, because the debt being extinct as to the bank which is principal, must be extinct as to the stockholder also, whose liability is secondary ; and if it be a mere statutory liability, without reference to a contract of any sort, the liability must cease with the statute by which alone it had an existence. This Court has held it to be a statutory liability, and not created by contract either expressed or implied. *Lane vs. Morris,* 10 *Ga. R.* 164 ; *Thornton vs. Lane,* 11 *Ga. R.* 497. There

is nothing in the statute which, by any legitimate rule of construction, could be held to extend the liability of the stockholder, beyond that of the bank.   There is nothing in the 11th section of the Act which points to it, but the contrary, for it declares that the stockholder shall not be relieved of his liability by sale of his stock.   There can be no sale of stock after the expiration of the charter, for there can be no stock in a dead corporation.   The 16th section of the Act looks to the failure of the bank, and not to its dissolution.   The stockholders who may have sold their stock within six months prior to its failure are held liable.   The whole section contemplates an existing, but insolvent bank, one unable to pay its debt.   This Court has given a construction to the terms "ultimate liability" as used in this charter.   It means a secondary liability, neither more nor less, in substance, than an endorsement in the *second instance*, by which the holder of a note is bound to prosecute the maker to a *prima facie* case of legal insolvency only, or to assign some satisfactory excuse "for not doing so."   *Thornton vs. Lane*, 11 *Ga. R.* 517.

Such is the meaning affixed to the terms "ultimate liability." Upon that construction of them is the plaintiff now proceeding.   It does not mean in this charter, that the stockholders shall be liable to redeem such notes as are in circulation after the expiration of the charter. If so, the suit in this case could not have been instituted until after that time.   This Court has held that the remedy may be pursued after the judgment of forfeiture, but it has not decided that it could be pursued after the expiration of the law.   The judgment of the Court, was upon the effect of the judgment of forfeiture upon the debts, and it is true the Court said, that the remedy against stockholders might be pursued after the *final* dissolution of the corporation which would include a dissolution by the expiration of the charter, but that was *not* the judgment of the Court, because the record did not make the point. *Thornton vs. Lane*, 11 *Ga. R.* 496.

It could not have made it, for the charter had not then expired. Now there is a difference between the effect of the judgment of forfeiture rendered against this bank, and the expiration of the charter. At the expiration of the charter, the corporate body *was dissolved.* By the judgment of forfeiture *it was not.* I expressed my opinion pretty fully on the effect of the judgment of forfeiture in the case of *Robison vs Lane,* 19 *Ga. R.* 360. That judgment, as I then said, " did not annul the charter, and amounted to no more than a judgment of seizure of the liberties, franchises, &c. into the hands of the State, and that the " *bank*" be prohibited from using any of the franchises, &c. conferred on the grantees in the charter, and from intermeddling therewith." If it did not dissolve the corporation, the debts did not become extinct, it left the statute in full force; the proceeding instituted against the bank for the forfeiture of the charter was an information in the nature of a writ of *quo warranto,* and the judgment on such an information, is not a judgment of dissolution but of seizure and ouster. But if the effect of the judgment had been to dissolve and annihilate the corporate body, the Legislature protected the property, effects of all sorts, debts, obligations and contracts of the corporation, from the effects of the common law rule, by providing for their preservation, first for the creditors, next for the stockholders. The first Act of our Legislature which authorized proceedings for the forfeiture of bank charters, aimed no doubt at their annihilation, but it intended also to preserve the assets for the benefit of the creditors, for it directed them to be immediately placed in the hands of a receiver for that purpose. Without pausing to enquire whether, upon a judgment dissolving the corporation, the provisions of this Act would not have saved the debts from extinguishment, I will say that prior to the judgment of forfeiture, relied on, in this case, which was pronounced in 1843, the Legislature passed an Act declaring that the judgment should dissolve the corporation for all purposes

Robison vs. Beall.

whatsoever, saving and excepting as to its power, in its corporate name, to collect and pay its debts," &c. &c. The Judge was directed to incorporate the exception in his judgment, and although he did not do it, the judgment which he did pronounce, being a judgment of seizure only, as I have elsewhere shown, had precisely the same effect and no greater. *Robison vs. Lane*, 19 *Ga. R.* 360. It was not a judgment of dissolution and did not extinguish the debts, and I so said in that case. It certainly did not put an end to the unexpired charter and therefore left the law of full force against the stockholder. As long as the Act existed his liability remained. But the charter expiring, the law expired, and being one and entire, passed for a single purpose, the whole Act expired, there being no expression in it to keep it alive for any purpose.

But there is a view to be presented of this demand regarded as a statutory liability only, which would aid much in the construction of the charter, if there were anything ambiguous in it to construe. In the charters of several of the banks of this State, in which the stockholders are made individually liable, it is declared that the persons and property of the stockholders shall, *at all times*, be pledged and bound for the *ultimate* redemption of all notes or bills issued, &c. Here the terms "at all times" and "ultimate," are used, one fixing the nature of the liability, and the other, its duration. Considering these charters as mere statutes, disconnected from the idea of *contract*, it follows that when the statute declares that the persons and property of the stockholders shall *be at all times* bound and pledged for the ultimate redemption of notes, &c., there can be no limit in point of time, on the liability of the stockholders, for by positive enactment it is continued to the future indefinitely.

But in charters where the words "at all times" do not occur, the statutes do not create a perpetual liability, but that matter is left to the control of the common law.

Hence the words "at all times" not appearing in the charter of the Planter's and Mechanics' Bank of Columbus, it

follows that that statute has no effect to extend the liability beyond the time at which, according to the principle of the common law, it would end. I have already shown that according to these principles it ends with the expiration of the charter. This Court has decided, as already remarked, a case, *Moultrie et al. vs. Hoge*, 21 *Ga. R.* 513, but slightly differing from the one before us. The difference is in the *facts* of the case, rather than in *principle.* That was an action against the directors for an excessive issue of bank notes happening during their administration. The provision in the charter was extraordinary, as it made directors who were absent, or who being present dissented from the resolution or act by which the excess was created, equally liable with those on whom the responsibility rested. The charter prescribed the remedy; an action of debt. It declared that the liability imposed on the directors should not exempt the corporation or its property from being also liable for and chargeable with the excess. The same charter enacted that the persons and property of the stockholders should, *at all times,* be pledged and bound for the ultimate redemption of their notes, &c. There is no enactment that the directors should be *at all times* liable. We held in that case that the liability of the directors expired with the charter. Sickness prevented my writing out my opinion concurring in the judgment pronounced in that case. The Courts cannot enforce a right which has no foundation except in the defunct provisions of an expired statute. The statute incorporating the Planter's and Mechanics' Bank of Columbus, having expired, and there being no provision in that or any other statute for continuing the liability of the defendant as a stockholder, if his liability were statutory entirely, it ceased with the expiration of the statute and cannot be enforced.

I will now proceed to examine the charter as a contract, and ascertain the defendant's liability in that aspect of the case. In England private acts of Parliament are regarded in the light of contracts made by the Legislature on behalf

of every person interested in anything to be done under them. *Dwarris on Stat.*, 651. Whether an act is public or private, does not depend on its having a clause declaring it a public act, but upon the nature and substance of the case. *Ib.* In this country acts of incorporation have been decided by the highest authority to be contracts, and contracts of such obligation and force that the Legislature can neither repeal or modify them unless the power to do so be reserved in them. In England, Parliament has that power, and exercises it on proper occasions, whether the charter of incorporation proceed from the crown or from Parliament. The corporations accept their charters, subject to this power in Parliament, and the law, therefore, in this respect enters into all such contracts and makes a part of them.

It is probably a misfortune that any other decision was ever made in this country. All charters in this country are by Legislative acts, but they are nevertheless contracts.

The charter now under consideration was a contract. But the mere passing the act of incorporation did not make it a contract, although the names of certain persons were inserted therein as corporators. It was the subscription to the stock, or the acceptance of the charter which made it a contract; and, in determining upon that, each person acted on his own judgment, and is bound by the contract as he. made it. It is to be construed by the words, like all other contracts, according to the intention of both parties. That one of the parties is the Legislature does not vary the rule of construction, nor does it give one party any greater power over the contract to add to its terms in any respect, than if both the contracting parties were persons. And the same may be said, if the contract be made in reference to an Act of the Legislature. The change of that Act cannot add to the obligation of either party. Those principles were acted on in the case of the *Union Bank of Maryland vs. Ridgly.* That was a suit by the plaintiff against the defendant as one of the sureties in the bond of Ralph Higginbottom, as

cashier of the bank.　The bank was chartered by the Legislature of Maryland in the year 1804.　The Act was to continue in force until the expiration of the year eighteen hundred and fifteen, and until the end of the next session of the Assembly thereafter.　Ralph Higginbottom was appointed cashier on the first day of March, 1805.

. On the 30th day of March, 1805, he gave the bond and continued to be cashier and act in the capacity of cashier until the 25th day of May, 1819.　In 1815 the Legislature extended the charter to the 12th day of January, 1835.　Several breaches of the bond were assigned, such as embezzlement, false discountings, &c., by Higginbottom as cashier, extending down to the 25th day of May, 1819.　It was contended that the bond was only co-extensive with the original Act of incorporation, which expired on the 6th February, 1817, being the end of the session of the Assembly next after the expiration of the year eighteen hundred and fifteen, and that the defendant was not liable for violations of the condition which took place after the expiration of the original charter.　The Court in that case said that, in construing the bond, they must look to the intention of the parties at the time it was executed; that the intention, when ascertained, must govern the contract of the parties.　" When the bond was executed, then, the Act of incorporation under which it was given was limited in its duration to the 6th of February, 1817.　The bond looked to the time for which Higginbottom was appointed, and that was restricted by the limitation of the charter as it then stood.　What then was the intention of the parties? and where is that intention to be found?　Where but in the original Act of incorporation, under which the bond was executed?　And looking to that Act, it would seem very clear that no responsibility was contemplated beyond the period of its duration"—there was no idea then of carrying it any further.　" The parties knew the legal duration of the charter expressed upon the face of it; they contracted with a view to that duration and the contract

must be expounded as the law was when the contract was made." 1 *Gill and Johnson* 324—433. Every person who examines a charter for a bank for the purpose of becoming a stockholder, no doubt, considers all its provisions well and scrutinizes none more closely than that which is to fix on him a personal liability, in certain events; and he contracts subject to the law which applies to such things. It is a rule of law that no personal liability attaches to the individual members of an aggregate corporation for the debts of the corporation. It is another rule of law that, on the dissolution of a corporation of that sort the debts due to and by it are extinguished. It is another rule of law that on the expiration of the charter of an aggregate corporation, the corporation is dissolved, unless there be a provision therein to preserve its existence beyond that period for some special object. These are the rules of the common law, but they may be changed by statute. The insertion of a clause in an Act of incorporation, that stockholders and their property shall be liable for the debts, or any part of them, of the corporation, is an improvement upon old charters for the public benefit and binds the corporator to the full extent of his undertaking. What was the undertaking of the stockholder who became a subscriber to stock in the Planters and Mechanics Bank of Columbus? How did he intend to bind himself? He intended to bind himself ratably with the other stockholders, in proportion to the amount and value of his stock for the ultimate payment of the debts of the bank, due by bill or note. This Court has held that in that respect, he construed his liability correctly. What construction did he place on the word " ultimate?" He ought to have construed it as this Court has construed it, as a *secondary liability.* The plaintiff in this case has construed it in the same way, for he has instituted suit against the bank; he has obtained judgment, and had execution issued against the bank; on that execution the sheriff has made the return of " no property," and on these premises the plaintiff avers that an ac-

tion hath accrued to him to have the amount sued for, from the defendant. That construction is right also. If this construction be right, then, the notes or bills issued by the bank and now sued on, were debts due by the bank during its existence. The notes constituted the principal debt and the bank was the principal debtor. The personal undertaking of the stockholder in the 11th section of the charter was accessory to it. According to one of the rules of law stated by me above, the debts due by the bank, would have become extinguished at the expiration of the charter, the law remaining unaltered. The extinction of the principal obligation, necessarily induces that of the accessory. It is of the nature of an accessory obligation that it cannot exist without its principal. *Evans' Poth. on Ob.* 209. This rule of the French law applies certainly to sureties proper; but it is the common sense of all accessory obligations, and Mr. Chitty says it has its full influence in the English Courts. But the stockholder by agreement, might extend the duration of his accessory obligation beyond the period at which the principal obligation would become extinct. But the charter which is his contract, is not to be so construed unless there is some expression therein which authorizes the inference of such intention.

It cannot be inferred from the fact that the corporation being an artificial person, the debt is necessarily extinguished against it, there being nothing in the charter to prevent that effect by its dissolution, but that he being a natural person is capable of being sued. Nothing but a contract express or implied that these debts should remain debts against him can authorize their recovery from him, after they have become extinct, as to the party primarily liable. There is no express contract certainly to that effect. It cannot be inferred from the engagement to the *ultimate* payment of the notes and bills. That word "*ultimate*" has been construed by this Court. Now what right had the subscribing stockholder to interpret that term as fixing on him a temporary liability,

ending with the charter, and not a permanent liability? He was justified by a very fair rule of interpretation, and one which would seem to settle the matter very conclusively. During the session of 1836, the Legislature passed five Acts incorporating banks. The Act under consideration was one of them. Its provisions have already been stated. The stockholders could not relieve themselves from liability by the sale of their stock except by giving sixty days notice in a public gazette, and they were to be, nevertheless, liable if the bank failed within six months of the sale. The charter of the Ocmulgee Bank held the persons and property of the stockholders *for the time being*, pledged and bound for the ultimate payment of the bills and notes of the bank. As regards the duration of the ultimate liability of the stock_ holders, the terms of the charters, those of the Planter's and Mechanics' Bank of Columbus and the Ocmulgee Bank are the same. The charters of the Bank of Brunswick and of the Western Bank of Georgia declare that the persons and property of the stockholders shall, *at all times,* be pledged and bound in proportion to the number of dollars issued upon each of the shares, &c. &c. The Bank of St. Marys has no personal liability clause. Here were five charters for banks passed by the same Legislature. Persons desirous of vesting funds in bank stock, knowing that when they became subscribers for the stock, the charter would become their contract, would, of course, look to the provisions of each Act. In some of them they would find that, on subscription, they would become bound "*at all times*" for the ultimate redemption of the notes and bills of the banks. In others they would find that they would *not* be bound *at all times*, for their ultimate redemption. There is a difference, manifestly. The omission of the words "*at all times*" in one charter and the insertion of them in another, in reference to the same thing—the personal liability of the stockholder—certainly indicate strongly that there is to be no limit to the liability in the one case, and that in the other there is to be a restricted

liability.    Every man would so construe it, and would know that if he subscribed· to the charter declaring that "*at all times*" he would be liable &c., he would enter into a very different contract, from that to which he would become a party by subscribing to a charter which contained no such words. The duration of a charter and of the obligations it imposes on those who make it their contract is a matter of much moment.    Some men might be willing to subscribe for stock in a bank, whose charter was limited to a term of years, say to fifteen or twenty years, the end of which they might probably live to see; when they might not subscribe for stock in a bank having a permanent charter, which must necessarily survive them.    They might be unwilling to leave to dis, interested representatives, or young and inexperienced descendants, the duty of looking after and supervising interests which it might require the most vigilant and skillful persons to protect.    The stockholders in the Planter's and Mechanics' Bank of Columbus, contracted, then, for a liability of limited duration, as the words "at all times" are not to be found in the charter, in connection with the personal liability of the stockholders, and the duration of the charter became a material part of the contract.    But it is said that by the Act of December 15th, 1855, *Pamp's, 55–56, 226,* the assets of expired corporations are preserved for the creditors and stockholders, and the stockholder cannot be injured by having his liability continued.    This Court is unanimously of opinion that that Act does not extend the duration of the individual liability of stockholders.    That remains to be determined by the original charter.    As was said in the case, in *Harris & Gills' Rep.,* already referred to, "What the contract was, at the time it was entered into, so it remains."    In that case, it was said, the Act extending the duration of the charter could not enlarge the liability of the defendant without his consent. The principle is incontestable that the terms of a contract cannot·be altered without the consent of the parties to it. They are respectively the only judges of the effect of a

change, and it cannot be made without their consent. The Act of '55 does not propose to extend the duration of the charters, but only to preserve the real and personal estate and assets of all descriptions from the effects of the common law rule of reversion, forfeiture, and extinction. It was on the principle I have been discussing that it was decided, in the case of the *Hartford & New Haven Railroad Company vs. Croswell, 5. Hill's Rep.* 287, that a company incorporated for a particular object, cannot be authorized to engage in any other and new enterprise, so as to bind a stockholder, without his assent. The subscriber in the original company is regarded as having vested his money in a particular enterprise, and neither the Legislature nor the company have the right to divert it from that object and apply it to other purposes without his assent.

The case cited from the Maryland reports was the case of a surety, and the liability of a surety is "*stricti juris,*" but the cardinal rule for expounding his contract is the same as that for expounding any other contract—the intention of the parties; and I referred to that case for the purpose only of showing the rule and its application to cases, where statutes affect contracts. In many of the cases, heretofore decided, stockholders have been referred to as sureties, and if that be the correct light in which they should be viewed, the law of sureties should be applied to them. I am not disposed to consider them as strictly sureties, for a surety is not interested in the consideration of the contract. Every stockholder in this bank is interested in the consideration. My brothers, LUMPKIN and BENNING, have both expressed the opinion that they are sureties; but the former in a more recent opinion, has questioned the propriety of so considering them. In one view of the case, however, we are all agreed: that the liability is secondary and that is their contract. The Legislative construction is the same. By the Act of 1841, " to facilitate the collection of debts from incorporations and the stockholders thereof" an execution could not be issued against stock-

holders, until an execution had been first sued out against the corporation and a return of "no corporate property to be found" had been made thereon by the proper officers.  *Cobb* 541.

There being nothing in the charter of the Planters and Mechanics Bank of Columbus, to continue any of its powers or faculties, or to authorize the Legislature to continue them, without the assent of the stockholders, so as to prolong or perpetuate their personal liabilities, after the expiration of the charter, no Act of the General Assembly, however efficacious it may be, to save the property and effects of expired corporations for the benefit of their creditors and stockholders, can extend the duration of the personal liability of stockholders, without their consent, beyond the period, at which, according to the stipulations of the charter it was to end. Whether the stockholders are to be viewed as principals or sureties in the contract, the Legislature can not add to the terms of their obligation, without their consent, stipulations which did not belong to it when it was entered into.   If by the charter as it was passed, the debts of the bank according to the existing law, would have become extinct on its expiration ;  and the stockholders being only secondarily liable, whether as sureties or not, the debt could not have been recovered against them ; except by express agreement, or one so strongly implied that the intention to be bound, could not be mistaken ; the passing of a subsequent Act to preserve the debt from the effects of the then existing law as against the bank, cannot superadd terms to the stockholder's contract.   That stands as it was when entered into.  As was truly said in the opinion of the Court, delivered in the case of *Mumma vs. The Potomac Company,* 8 *Pet.* 281, " every creditor must be presumed to understand the nature and incidents of such a body politic," (a corporation,) " and contract with reference to them."   That the creditor does not understand the contract, is no reason, in law for the Courts to change or modify it, to conform to his notions of it.   It must stand as the parties made it.   Cases in New York have

Robison vs. Beall.

been referred to as establishing the right to continue suits against the stockholders, on individual liability stipulations, or laws, after the dissolution of corporations.   Their authority rests upon a New York statute which is not of force here.   By that statute the individual liability commences at the dissolution of the corporation.   In this case the individual liability ends with its dissolution.   It was not the law in New York, that such a liability survived the dissolution, until the Legislature of that State passed the Act.   It cannot be law here until the Legislature of Georgia passes a similar Act; '' less it makes such liability a part of the Act of incorporation when passed, as it has done in some instances, by declaring that the stockholders shall "at all times be liable."   One inconvenience, indeed injustice, may result to creditors by the protraction of suits against stockholders, commenced in time, but kept in Court by defenses until the expiration of the charter.   That is the fault of the law, and it ought to be amended.   Every man who is sued, is entitled to make his defense, but the law ought not to permit the mere persistence in a defense to produce a lapse of right ; but at the same time care should be taken to prevent the gross injustice of continuing a remedy against a party secondarily liable, without affording him the means of redress against the party primarily liable.   There has been no adjudication of a case under one of the charters which declares that the stockholders shall at all times, be liable, but it is by no means clear that the Courts would not be bound to construe the charter as saving the remedies against the stockholders and holding the corporate assets liable, while for all other purposes, the corporation was dissolved.   It is time enough, however, to consider that question when it arises.   As unjust as the law is, which admits a defendant's protracted defense to defeat the plaintiff's right, after incurring expenses, under a public law, in prosecuting it, it is unquestionable law and has been enforced always.   In the case of *Yeaton vs. The United States*, 8 *Cranch's Reps.* 281, Chief Justice

Marshall, delivering the opinion of the Court, said "it has long been settled that after the expiration or repeal of a law, no penalty can be enforced, nor punishment inflicted, for violations of the law committed while it was in force, unless some provision be made for that purpose, by statute." Congress had passed an Act (on the 28th Feb. 1806,) prohibiting intercourse with certain parts of the island of St. Domingo. The Act was limited to one year. By an Act of Feb. 1807, it was continued until the end of the next session of Congress which expired on the 26th April, 1808. The schooner General Pinckney was libelled on the 6th Jan. 1807, for a violation of that Act, and condemned in the District Court on the 23d of July following, which condemnation was affirmed in the Circuit Court on the 7th of Nov. From that sentence the claimants appealed to the Supreme Court of the United States on the 1st Monday in Feb. 1808, where the cause was continued until Feb. Term, 1809. On the ground that the statute had expired, before the hearing in the Supreme Court of the United States, the whole cause having been brought up by appeal, unaffected by the condemnation, and there being no law then upon which the cause could be tried, the judgment of the Court below was reversed. The same decision, was made in the case of the schooner *Rachel vs. The United States,* after the sentence of condemnation was passed, and the vessel sold, and the proceeds paid over to the United States, while the Act on which the condemnation was pronounced was in force. The Act having expired before the cause was tried in the Supreme Court, that Court made an order for the restitution of the property to the claimant. *6 Cranch's Reps. 329.* These were cases on penal statutes, public, not private Acts, and having nothing in the nature of contract about them, and are referred to simply as cases which show that Courts cannot extend a law after its expiration, to enforce a right to which the party became entitled under it, during its existence, although the case was delayed by a protracted defense. The conclusion then, of

which I have come is, that the charter having expired, the right of the plaintiff in the Court below to pursue the defendant in this case, expired with it:

That he contracted that liability in reference to the law, which at the time of subscription, would have extinguished the debts sued on, at the expiration of the charter, as the debts of the bank, the party primarily liable:

That the debts being extinguished as the debt of the party primarily liable, they would be extinguished as the debts of the party secondarily liable also:

That such being the contract of the party, no Act of the Legislature, subsequently passed, could vary it and extend the duration of his liability without his consent:

The Act of 1855, by changing the rule of the common law, in respect to the assets of dissolved corporations, did not convert the liability of the defendant, which by contract was limited in point of time, into a perpetual liability. That the defendant was transferee of the stock on which he is sought to be held liable does not vary the case, as the suit was instituted prior to the passing of the Act of 1855, and the transfer must of course, have preceded the suit. But I am not to be understood as holding, that if the defendant had taken the transfer of the stock subsequent to the passing of that Act, he would have been liable, and that in that respect, the contract of the original subscriber, would not have been his contract. I leave that question open.

I think therefore, that the request to charge the jury, as made by the counsel for the plaintiff in error in respect to the effect of the expiration of the charter on the debts sued on, ought to have been given by the Court, and that because of the refusal of the Court so to charge, the judgment of the Court below ought to be reversed. This decision is put on the ground herein stated, and not on the ground that for no cause can a stockholder in a bank or other corporation be sued after the expiration of its charter, or after its dissolution otherwise. All deceitful practices by which others are defrauded

Robison vs. Beall.

are condemned by the common law, and a party injured by such practices is afforded a remedy by the common law. But in this action the party defendant is not charged with fraud, and is not called to defend himself against such charge. From evidence delivered in other cases which have been reviewed before this Court, it is most manifest that the greatest frauds were committed in the organization of this bank, and in putting it in operation, by which billholders and other creditors, have been greatly damnified, and for which they are entitled to redress, whether the corporation has been dissolved or not. This liability depends, in no manner, upon a provision in the charter, but on other principles. Persons may be liable, in my judgment, even if they have been crafty enough, after committing a participation in the fraud, to sell their stock, and to relieve themselves from either statutory liability or personal liability, under the charter as their personal contract, by whatever name it may be called, by giving all notices, &c., necessary to secure their exemption from personal liability under their charter. If this fraud has contributed to the failure of the bank, or to depreciate in value a currency which they were authorized by law to substitute for coin, they are liable at common law, in the proper forum, to an injured party for the consequences. When a bank is chartered, organized, and proceeds to issue notes of circulation, the community have a right to presume that every thing has been done which is required by the charter to ensure their permanent credit, their safety and soundness as a currency. They have a right to presume also, that after it goes into operation, nothing will be done inconsistent with honesty and good faith to impair their credit and value. They have a right to presume that no part of the capital will be withdrawn by the stockholders who are not entitled to it, or any part of it, until creditors are paid, for whose benefit it was required to be paid in the first instance. When what ought to be done is not done, or what ought not to be done is done, and creditors are injured thereby, they are entitled to redress from

those at whose hands the injury was sustained, let it be called by whatever name—violations of duty, breach of trust, or fraud.  In whatever light it is considered, it is a personal wrong and injustice to those who suffer, not dependant on any charter regulations for remedy, and for which those at fault are liable.  If stockholders and officers of banks do their duty, it is impossible for a bank to fail.  If, in the first instance, they pay in specie the amount required to be paid, and allow it to remain as permanent capital; if they make no excessive issues of notes of circulation; if, in discounting notes, they see that the makers and endorsers are unquestionably solvent; if they loan on such terms that, at short notice of approaching difficulties in monetary affairs, they can make all their means available; and if they never become borrowers from themselves, the holders of their notes and other creditors will always be paid.  If, by omitting to perform a legal duty, or if they do an illegal act, by which creditors are injured, there can be no question but they may be proceeded against in a manner, and by a proceeding, that will compel those to account who have done the wrong, and at once give relief to all entitled to it, who will come in and aid the suit. A Court of Chancery, on a bill of that sort, can so regulate its proceedings, and adjust the rights and liabilities of the parties, by its decree, as to do ample justice to all, and compel individuals to account for frauds and wrongs, who have dishonestly abused the privileges granted a corporation, of which they were members, by fraud, to enrich themselves.  All may be joined as plaintiffs, who are interested in the investigation; all may be made defendants who are liable to respond; and if, by the dissolution of the corporation during the pendency of the suit, the law terminates the liability of any of the parties, the suit may proceed against those whose liability arises from their wrongs or frauds, and against whom there is a remedy as old as the common law.

## Note by Judge McDonald.

In the year 1852, the counsel for the plaintiff in error, sent me a copy of the argument which he had prepared in this and other cases, as I supposed, involving the points made in the record in this case, and did me the honor to ask my opinion on them, which I gave him in a letter hastily written. Among the points on which I gave him my opinion, was the effect of the statute of limitations on suits against stockholders in the bank. Before the case in which the foregoing opinion is delivered, was reached on the docket, the counsel for the defendant in error placed in my hands a copy of that part of the letter above alluded to, which applied to the statute of limitations. When the cause was called for argument, he made a motion in open Court that I would not preside. I declined presiding on two grounds: 1st. Because I had, in that letter, given an opinion very fully, on one of the points in the record, and which opinion I considered as having been given in each and every case against stockholders of that bank, to which it applied, and was therefore within the spirit of the rule on which every member of the Court had acted since the organization of the Court, to-wit: if he had been employed in a particular cause, when at the bar, he would not preside in that cause, if carried to the Supreme Court by writ of error. I had not been employed in any of the cases, and for that reason, it was insisted that I should preside ; but if the reason be a good one, which would render it proper that a Judge who had been, when an attorney, employed in a particular cause, and had advocated a principle, not because it was his opinion, but because it was necessary to the success of his case, should withdraw, if that cause was carried to the Supreme Court, and not preside when it was heard, it was more proper that a Judge should not preside, whose opinion, while at the bar, had been given under no such influence.

2d. Because it might give rise to a practice of seeking the

opinion of legal gentlemen in particular cases ; that the party asking it, might use his exertions to place the gentleman who gave it, in a position where that opinion might benefit him. A Judge should discountenance, by as efficient means as are in his power, a course of this sort ; and none seemed to me to be so effectual and proper, as to decline presiding, if promoted to the bench, in cases in which his opinion had been sought when at the bar.    I will remark, that I consider the counsel who sought my  opinion in these cases, incapable of acting from a motive of that sort.

After I  had declined presiding in the  case, a proposition was made in open Court, that I should preside with my brother Judges and hear the cause, on all points except the statute of limitations, the point on which I had expre.sed an opinion.    It was assented to, and I did preside.    Since the decision of the cause, I have received a letter from  the counsel for the defendant in error, in which he states, in substance, that he is satisfied that Col. Hines  Holt has in his possession my  written opinion on the question  of the extinguishment of the debts of a corporation on  its dissolution, obtained at the same time, and in the same manner, as was my opinion on the question of the statute of limitations, and which in my judgment had  rendered me incompetent to  preside in this case.    He did not know, at the time, that such was the fact, and supposed that it had escaped my  recollection.    He had made an unsuccessful effort  to obtain a copy of the  opinion, that he might communicate it to me.    On receiving that letter, I immediately wrote to Col. Holt, saying to him  he had my full permission to communicate to Col. Dougherty, or any one else, whatever I had written or said to him in relation to the bank cases.    I requested him to furnish me with the originals or copies of all writings of mine, whether letters or other things, which he had  or could control, containing any matter or thing  relative to the said cases.    He sent me the letter from which Col. Dougherty had  made the extract, which he placed in my hands, at Court, as the only writing

he ever had from me on the subject. Col. Dougherty request-
ed me, that, on obtaining from Col. Holt a copy of the opin-
ion which I had given, if it should be such an one as it was
understood to be, I would conform, as far as I could now do
so, to the course pursued by me on the question of the stat-
ute of limitations. He was aware that the particular judg-
ment was reversed, but he suggested, that, if I thought prop-
er to do so, I could limit its effect to that case; and that by
adhering to the course and the reasons given therefor, at the
trial, prevent its effect on the trial of the same case and others
of the like character, that I could arrest the effect of what I
had held, and which is admitted universally to be wrong.

I have very fully considered this application, and the rea-
sons assigned for the request, and I will remark, that on read-
ing the letter which I wrote to Col. Holt, in 1852, I found it
was very full on many points involved in this case, and goes
beyond the expression of an opinion of the effect of the dis-
solution of the corporation upon the debts of the bank. I
cannot comply, however, with the request of the counsel, for
various reasons :

1st. Upon objection being made to my presiding at the tri-
al, I determined, for the reasons assigned, not to preside. My
resolution extended to the whole case, and I should not have
presideu to hear any part of it, but with the consent of coun-
sel on both sides. The counsel for defendant in error assent-
ed. The reasons assigned for the request now made, was,
that I had given a written opinion to Col. Holt, " on the ques-
tion of the extinguishment of the debts of a corporation on
its dissolution." On that question there is no disagreement
among the members of this Court, nor in the legal profession,
that I have ever heard. All concede it to be the law, that on
the disssolution of a corporation its debts are extinguished.

In the next place, my judicial opinion on the precise point is
given in the published report of a case decided by this Court.
Such an opinion could furnish no ground of objection to my
presiding, it is true; but in this case, after I had declined pre-

siding, the counsel might have refused his assent without as-
signing a reason.    It was not like making an objection.    He
gave his consent, knowing the  opinion  I had  expressed ju-
dicially.

But I went further in my letter to Col. Holt, than to express
an opinion,  that on the  dissolution  of  the corporation, the
debts became extinct.    "The plaintiff at law," I  say in that
letter, " prosecuted suits to judgment on the notes of the bank,
and having failed to  collect the  amount,  he seeks to collect
the amount from the defendant at law, as a stockholder.    Can
he do this?    He cannot, I most respectfully think."    I gave
no reasons for  that opinion.    But it was expressed, and  al-
though I had  forgotten writing so full a letter  on the points
which I discussed,  I should not  have presided on  the  trial
without the consent of all the parties.    That I gave this opin-
ion on the point, *in the manner I did,* is not, in my opinion,
now  that it is brought  to my notice,  sufficient  to upset the
judgment I have pronounced in this case.    If so, the expres-
sion of any forgotten opinion on a case with which I had no
concern as counsel, and on a point which it appeared I had
not investigated,  would  disqualify me for  presiding, if that
cause should be brought before this Court.    But if I had ar-
gued this point as fully as I  did the  statute  of  limitations,
still I ought not to do the opposite party the injustice of yield-
ing  to the request made of me.    That letter had  been read
before the Supreme Court, in the presence of the counsel.    It
was so stated in Court.    That, however, was unknown to me,
but it certainly put the  counsel in possession of the contents
of the  letter.    The extract with which he furnished me, is
from the same letter, and I must presume that he acquainted
himself with  the contents  of the entire letter  when he made
the extract.    If  he  had  forgotten it, after having  seen it so
much more  recently than I had, with a powerful motive  to
remember it, it is not remarkable that it  had passed  wholly
from  my mind, who had  no  reason to remember it.    I can-
not comply with the novel request  of the counsel,  but leave

the opinion and the judgment it was intended to support, to stand for whatever they are worth. I have not the slightest reason to question the soundness of the legal principles decided.

COLUMBUS, Jan. 4th, 1858.

*Hon. Cha's J. McDonald:*

SIR : In a note to your written opinion in the case of *Beall vs. Robison,* as published in pamphlet form, giving your reasons for not complying with my request, as to limiting your judgment under the circumstances, to that particular case; I notice that you say, " that letter" (meaning the one written by yourself to Col. Holt before your election, containing your opinion in the Bank cases) " had been read before the Supreme Court in the presence of counsel. It was so stated in Court. That however was unknown to me, but certainly put counsel in possession of the contents of the letter." You of course intend to be understood by the words " in the presence of counsel," to mean in my presence. Such is not the fact. The extract, a copy of which I furnished you, was read before the Court, *but no other portion of that letter.* That part containing your opinions, that the billholder could not recover, and that his debt was extinguished, &c., was never read in my presence, before the Court or any where else. Nor was it ever stated in Court in my presence, that the letter had been so read. The manner and connection in which the statement referred to is made by you, is well calculated, and in fact, does me *very great injustice.* As to your inferences, I have nothing to say. Perhaps you have the right to draw just such as you think proper. But when you come to state the *facts* from which they are drawn, I have the right to be correctly represented.

As the opinion referred to, as is understood, is in advance of many cases decided before it; I presume it has not as yet been authoritatively published in the Reports. I have thought it proper to bring this matter to your notice, that an

opportunity may be afforded you of making the necessary correction.

  Yours, &c.

        W. DOUGHERTY.

      MARIETTA, 7th January, 1859.

*Col. W. Dougherty :*

 I have received yours of 4th January 1858—manifestly a mistake in the date, as to the year.  My recollection of the statement in Court is such as I have stated it in my publish-ed note to which you refer.  My recollection is further, that you were present when it was made, just as stated.  I un-derstood the counsel as speaking of the letter, the whole letter.  If I find that I am mistaken in this, I will cheerfully correct it in an additional note, and if I find there is a mere difference of recollection  between us, I will in a note to the decision in the  Reports, give the account  you  give me of it in your letter with a great deal  of pleasure.  I have no dis-position to do you the slightest  injustice.  I spoke of noth-ing but the statement  in Court, as I had no personal know-ledge of the reading of  the letter or any part of it, before the Court at the time referred to by the counsel.

 I have the honor to be, yours, &c.

      CHARLES J. McDONALD.


LUMPKIN, J. dissenting.


 On the 30th day of December, 1836, the Legislature incor-porated a banking company, under the name of the Planters and Mechanics Bank of Columbus.   Certain persons named in the charter, with all such as might thereafter become stockholders, were made and declared  to be a  body  politic, by the name and style aforesaid.  And it was  provided amongst other things, that said corporation  or  company should  continue  until  the  first  day  of  January,  1857. *Prince,* 124-5.

Suit having been prosecuted to insolvency at the instance of the billholders against the corporate assets, actions were brought against the stockholders under the 11th section of the charter, to make them personally liable for the redemption of the outstanding circulation. This is one of the cases. And it is now contended, in behalf of the stockholders, that these suits must abate as to them, inasmuch as the charter has expired by its own limitation; and with it, all rights or remedies founded upon or growing out of it.

This proposition, or the principle at least involved in it, is not new in this Court. In the case of *Moultrie and others against Smiley and Neal,* 16 *Ga. Rep.* 289, the same question was made, and argued with a degree of learning and ability proportionate to its importance, and worthy of the high reputation of the eminent counsel engaged in the discussion. And after mature deliberation, this Court held, that an action brought against the directors of the Commercial Bank of Macon, to make them individually chargeable, under the personal liability clause of that charter, did not abate by the expiration of the charter, during the pendency and before the termination of the suit.

My opinion in that case occupies near forty pages of the Reports. To that, and to the concurring opinion of my brother Starnes, I refer, and reaffirm and adopt the same, (I will not re-write the argument,) without doubt or hesitation; but at the same time, with all the diffidence which the contrary judgment of my colleagues, and the magnitude of the interests involved, cannot fail to inspire. I am fully persuaded that the law, rightly interpreted, never was intended to work such gross and palpable injustice as the sanction of the doctrine, set up to screen this defendant, would establish. That this or any other bank may go on issuing bills and accumulating profits, by any and every means known to and practiced by moneyed institutions, till the day before their charter expires—the set time for which is known to nobody, or but very few—and while they hold on to all the gains they ac-

quire, escape responsibility to redeem the currency with which they have flooded the country, so shocks, at first blush, the moral sense of any man, that to give such a construction to the Act of the Legislature, it should be written in sunbeams.

To my mind there is no obscurity in the charter of this bank. To me it has been the guiding star through all the labyrinths of the multiplied, novel, and subtle discussions which have originated under it, within the last eight years. What saith the charter? has been my constant and invariable enquiry. And to my humble understanding, it has never spoken but one language—the same that was announced first by this Court in *Lane vs. Morris*, 8 *Ga. Rep.* 476, in 1850, and which has been reiterated in every subsequent decision: and that is, that the *right* of the billholder, under the 11th section of the charter, to hold the person and property of the stockholders pledged and bound for the ultimate redemption of the bills of the bank, in proportion to the amount of his shares, and the value thereof, is one which he may assert in his own name, before or *after* the dissolution of the corporation; one which is wholly above and beyond the reach or control of any future legislation; and that this is a supplemental or superadded security for the benefit of the billholder. An able writer in one of the public gazettes insists, that the 11th section of this charter has "cut up by the roots all the common law nonsense, as to the dissolution working an extinguishment of all the debts of a corporation;" and contends, that it constitues the stockholders simply partners. And he remarks, that it is a legal novelty to hold, that upon a dissolution of a *copartnership*, its debts are thereby extinguished. In support of his position, he cites *Angel and Ames on Corporations, pp.* 478, 486, 493; 17 *Mass. Rep.* 334; 2 *Wendell*, 269; 2 *Hill's N. Y. Rep.* 269; and 2 *Kent's Commentaries* 316, where the Chancellor comments without disapproval of the case of *Slee and Broom*, where the Supreme Court and Court of Errors of New York held, that such corporations were mere copartnerships. And that regard to the

interests of the community required that individuals, whose property thus put into a common mass enabled them to obtain credit generally, should not shelter themselves from a responsibility to which they would be held liable as members of a private association.

And I will take leave to add, that this individual liability clause, in modern charters, must it seems to me, go far to modify much of the old common law upon the subject of corporations. That the corporators, thus made personally responsible, should stand in the same relation to creditors as the individuals who compose a simple copartnership, is most obviously just.

This same writer utterly, and very properly, repudiates the idea that the stockholders are *sureties,* merely, in the restricted and legal acceptation of that term; and with it, the deduction that the discharge of the principal—the bank—is a discharge of the sureties—the stockholders. He says, and says truly, that when the stockholders are spoken of as sureties, guarantors, &c., it is a more convenient phrase to signify their *ultimate* liability. As well, he insists, may the members of common copartnerships, be called sureties, for they are not individually liable, till the partnership funds are exhausted.

" What," he asks, " is an incorporated bank separate and distinct from the stockholders? Is it not a myth, a shadow, a figment of the brain? Has it flesh, or bones, or blood? No; but it has assets and tangible property. Was it not the stockholders, through their agents, the President, Directors and Cashier, who procured these assets and this tangible property? And if these assets are missing or appropriated, do they not disappear through the same agency? Do not the stockholders claim these assets as their property? Are not all contracts made with the bank, made for the benefit of the stockholders? How absurd then to talk about stockholders being sureties for *their* bank!"

Chief Justice Bronson, anticipating that some honest

Robison vs. Beall.

Judge might get confused with this term sureties applied to stockholders, kindly admonishes him in this wise, in pronouncing the opinion of the Supreme Court, in *Harper vs. McCulloch*, 2 *Denio's Rep.* 123; "I think the stockholders, in their individual as well as their corporate capacity, are *principal debtors.* Although they have been incorporated with many of the privileges usually granted to men associated in that form, yet the privilege of exemption from personal liability for the debts of the company, has been denied to them, and their personal liability has been expressly declared. They are thus placed in relation to the creditors of the company, upon the *same footing* as though they were an unincorporated association or *partnership.* In one respect the burden is made more onerous than it would have been in going on without a charter; for the copartners are *severally* as well as jointly liable. But that does not affect the principle; nor is it affected by another provision, that lightens the burthens, by saving the stockholders from an action, until the creditors have *attempted* to collect the money from the corporation by proceeding to a judgment and execution. The stockholders are debtors from the beginning, although the creditor has no remedy aagainst them, until he has first *tried* to collect from the company. This is no more than applying an equitable principle, which requires that the debts should be paid from the joint funds of the associates, rather than from the separate property of any of them. I think the defendant was answerable to the plaintiff, as a *principal debtor;* and consequently, that he was not discharged by giving time to the company, which he would have been, if the individual corporators are to be considered in all respects as sureties."

But it is said, that this being a statutory right, does not survive the statute. That by the charter, the bank is first liable for the payment of the bills; and that upon the failure of the bank, the stockholders are secondarily liable, under the 11th section of the charter. And it is earnestly asked, "Can

it be imagined by the human mind, that the contract by the bank to pay, in the first place, is less strong, less obligatory, or less durable, than the contract with the stockholders?"

All I have to say, in answer to this position, so triumphantly assumed, is, that, in addition to the utter confusion of ideas, not to say sophistry, of endeavoring to separate the bank from the stockholders throughout this litigation—a notion so entirely demolished in the foregoing citations—I have attempted to demonstrate in *Moultrie et al. vs. Smiley and Neal*, and succeeded to my own satisfaction at least, that the debt, as against the bank itself, is said to be *extinguished*, not by any implied condition in the contract, but from necessity, because there was no person against whom it could be legally enforced.    It was the reason assigned for the rule, in the *Bishop of Rochester's* case, decided in the *38th of Queen Elizabeth*—the earliest reported case upon the subject.    It has been recognized and repeated in all the subsequent adjudications, from that day to this.    And neither counsel, with all their vehement declamation, have been able to overthrow it; nor learned Judges, with all their research, to furnish any other.

If this be so, the interrogatories, so indignantly propounded, are pointless.    For, although you are unable to sue a party *primarily* liable, because he is dead and has no representative, that is no reason why the remedy of the billholders should not be enforced against another party *secondarily* liable; and that too, whether he be a surety proper, only, or not.    And especially in a case like this, where the bank and the stockholders are, in reality, one and the same, and as indivisible as the Siamese twins.

Whose fault is it but the stockholders, that their bank charter was dissolved, by judgment of forfeiture, in June, 1843?    What peculiar indulgence have they upon the Courts and the country?.    They failed to discharge their obligations to the public; and for this default, after great forbearance, the Legislature directed their franchise to be revoked.

But this defense, which affects such a sense of outraged justice, is the more surprising, when it is recollected that the principle contended for, does not, and never did apply to the stockholders of this corporation. In this very case, there is a valid and subsisting judgment against *the bank;* and one capable of enforcement against the corporate assets, could any be found. The real estate belonging to this company, if it ever had any, never did revert to the grantor; its personal property never was seized by the State ; nor was this antiquated rule of the common law ever applied in Georgia, against this or any other corporation. What has become of the large amount of available assets which belonged to this corporation—it is not necessary or proper to examine into here. Suffice it to say, the State never clutched them ; and it is not pretended, that the creditors did.

But it is urged that the *Bank of St. Marys vs. The State,* 12 *Ga. Rep.* 475, decides this case. If I am capable of comprehending the simplest doctrines of the law, there is not the remotest analogy between Winter's case and this.

The Act of 1832 imposed a penalty of $100 for issuing or passing a change bill ; to be recovered by suit; one-half *when recovered,* to be for the use of the State, and the other half to go to the informer. In 1851–2, before final judgment was rendered against the bank, the Act creating the offence and fixing the penalty, was expressly repealed. And this Court held, and rightly, and the informer has acquiesced in it, by failing to prosecute a writ of error to the Supreme Court of the United States to reverse the judgment, as he threatened, and was encouraged by the Court to do ; *that no judgment could be awarded on the repealed statute ; that the repeal prevented the imperfect right from being consummated; that it was competent for the Legislature at any time to pass such repealing act before final judgment ; and that it mattered not, whether the whole penalty when recovered, is given to the public or to the prosecutor, or is divided between them.*

I trust this case, and the reasoning upon which the judgment of the Court rests, will be read; and the utter dissimilarity between that case and this, will be perceived at a glance. What vested right had P. A. Clayton, the informer, in the penalty annexed to a violation of the Act of 1832 ? None whatever, until reduced to final judgment. It belonged as of common right, to any citizen of the State, to institute this *qui tam action*, or prosecution. What consideration did Clayton pay for it? How different the billholder's condition. In the performance of his part of the undertaking with the stockholders of this bank, and relying upon their promise and pledge in the 11th section, to redeem the bills of their bank, if it did not, he took them for his property—his cotton —his slave—his horse. And I assert it confidently, it is not in the power of the Legislature to release them from their obligation.

In the case before us there was, in point of fact, no charter to expire by lapse of time. The charter had been terminated by a judgment of forfeiture, more than thirteen years previously; and notwithstanding this case went off upon this ground of the expiration of the charter. I cannot see how it could arise. One of the modes of dissolving a corporation is by forfeiture of its charter for an abuse of its franchises, by a judgment of a Court of Law. 2 *Kent's Com.* 305 *; 1 Black. Com.* 485 *; Angell & Ames on Corporations,* 648, *2d edition ;* 16 *Maine Rep.* 224, 314. Now, the Act of incorporation granted to this company in 1836, having been solemnly vacated and annulled in 1843, how it survived, to die a natural death in 1857, I do not understand.

I have neither the original bill of exceptions, nor a copy, nor the Reporter's statement of the facts, before me, to enlighten me concerning this matter. Notwithstanding the dissolution in 1843, this Court has uniformly held, from the first cases in 8 *Ga. Rep's,* 468, 486, down to the case of *Adkins vs. Thornton* 18 *Ga. Rep's,* 325, that the stockholders were liable for the ultimate redemption of the outstanding

circulation.    How could it hold otherwise, under the Acts of 1842 and 1843?    *Cobb's Dig.* 118 and 1820, as expounded by this Court, in *Robinson vs. Lane,* 19 *Ga. Rep.* 337.    And if all this· be so, what was there to *expire* in January, 1857? Were not the rights of the creditors, and the liabilities of the stockholders, fixed and determinable by the action of the Legislature and the Court, in 1842 and 1843?    But concede that this point is legitimately presented.    The Legislature grant a bank charter to a company, by accepting which they stipulate with all whom it may concern, that if you will take our bills, we bind ourselves individually to redeem them, provided the bank does not.    Under .this agreement, bills are emitted, circulated, and received, if you please, until the 1st day of January, 1857, when the stockholders insist the understanding is no longer binding.    Very well, say the billholders, fulfill your contract for the past, by redeeming the bills which you have heretofore issued, and which we have taken as a part of the circulating medium of the country, in the due course of trade and business.    No, we will not, respond the stockholders; our charter has run out by eflux of time! and, hence the obligation is no longer enforcible. To state the case, is to carry conviction to the conscience and bosom of all men.    What if the capacity to contract cannot extend beyond the period limited by law?    Does that interfere with what has already been done?    Is it in the power of the Legislature to impair the obligation, already incurred, to redeem their bills?    The Supreme Court of the United States, from intimations of approval already given, respecting the past decisions of this Court respecting these bank cases, would not hesitate, I feel well assured, in declaring any such attempt unconstitutional and void.

But the Legislature has been guilty of no such folly.    On the contrary, by the successive Acts of 1841–42–43, it has kept alive the corporate liability itself, so far at least, as to preserve the assets for. the purpose of discharging the liabilities incurred.    And if it be maintained that the old common

law rule of extinguishment of debts, is not founded upon the reason which I have assigned, and that is, that there is no one to sue or be sued, but upon a different principle, namely: that as the defunct corporation cannot collect the debts owing to it, that it is but equitable that it should be relieved from the payment of those which it owes; then I reply emphatically, that that reason does not exist here; for by the Acts to which I have referred, and the constitutionality of which has been uniformly affirmed by this Court, up to the present time, ample provision was made for securing and collecting the assets of this bank. 19 *Ga. Rep.* 337. And if any debtor of the bank has escaped upon the ground, that his liability was extinguished, either by the dissolution in 1843, or the expiration in January, 1857, it has never been brought to the knowledge of this Court. On the contrary, it has been again and again distinctly proclaimed, in the discussion of these bank cases, that the assignee suffered the debts to be wasted and lost, because he did not see fit, for reasons satisfactory to himself, to enforce their payment.

The principle, then, upon which the common law rule is upheld on the other side, having no foundation to stand on, in point of fact, in this case, the rule itself should not be administered.

But in addition to the Acts of 1840–41–42–43, which apply directly to the Planters and Mechanics Bank of Columbus, the Legislature, during the session of 1855–56, *(Pamphlet Acts,* 226,*)* passed a general law repealing, in express words, this rule of the ancient common law, and making specific provision for the collection of the assets of a defunct corporation. It was competent for the State to do this, even as it respects existing corporations: to declare that it would not seize and appropriate their property, either upon the forfeiture or expiration of their charters, but would provide for the appointment of a trustee to administer their effects, and apply the proceeds first to the payment of debts, and next to the distribution of the surplus amongst the stockholders.

Thus cutting up by the root all pretense on the part of the stockholders of this or any other corporation, to escape their individual liability ; because, as has been urged, it would be unjust to hold them responsible, when the corporate assets could not be made available, which were primarily chargeable.    This strikes from beneath them their last plank.

It has been intimated, that the omission of the Legislature to save the stockholders' liability by this statute, is significant of their intention not to do so. · For myself, I have held from the beginning, that the security given under the 11th section of the charter, to the billholders of this bank, was beyond the reach and control of the Legislature.    It was a statutory contract, which run on for twenty years from the time the right of action accrued ; and so the same Legislature has declared in accordance with the law and the decisions of this Court.    *(Pamphlet Acts, 233.)*    And hence the General Assembly would not be guilty of an act of supererogation, by enacting that which existed to the fullest extent already, even if they were clothed with the constitutional competency to do so.    But I forbear.    ·

So numerous have been the adjudications already, upon these vexed and vexing bank questions, that it has become a matter of serious labor, as well as of embarrassment, to review them.    The task would occupy a volume.    I have tried faithfully, and to the best of my poor ability, to hold the scales in just equipoise, throughout this exciting and vexatious litigation.    On the one hand giving to the charter that exposition which would effectuate the end for which it was granted, to-wit : security to billholders and to the public, and thereby, protection against an irredeemable paper currency.    And on the other hand, shielding the members of this corporation against all suits or actions, at the instance of those who shared, or participated in any way, in the illegal, not to say fraudulent proceedings, which. were had preparatory to the organization of this bank.    Under the salutary doctrines which were enunciated in the case of *McDou-*

*gald, adm'x, vs. Bellamy, adm'r, &c.,* 18 *Ga. Rep's,* 411, and to which I invite special attention, the outstanding liabilities of these stockholders have been reduced from between $220,-000 and $230,000, to between $40,000 and $50,000!

Satisfied in having been fully sustained by the Legislature, as its records will show, in every important principle, which I have ruled in these cases. from the beginning down to the present time; a just reverence for what I believe to be the law, and a conscientious desire to discharge my duty, impose upon me the necessity of dissenting from the judgment rendered by a majority of the Court in this case.